Defendants, Toye Bros. Yellow Cab Company, and the individual copartners thereof, have appealed from a judgment of the Civil District Court holding them responsible, in solido, for the personal injuries sustained by one Andrew Hero in an accident which occurred on August 5th, 1939, at about 10 o'clock a.m. when a motorcycle driven by Hero collided with a taxicab owned by the defendants on the riverside roadway of St. Charles Avenue at the corner of Foucher Street in the City of New Orleans. The suit was originally instituted by William S. Hero, the father of Andrew Hero, who was then a minor, wherein the father sought recovery for the expenses which he had personally incurred as a result of the accident and also restitution in damages, on behalf of his son, for the personal injuries sustained by the latter. Shortly after the suit was filed, young Hero acquired his majority and he became a coplaintiff in the proceeding.
Plaintiffs claim that the accident occurred exclusively through the fault of the taxicab driver. Defendants, on the other hand, maintain that the cabdriver was without fault in the premises and that the accident resulted from the negligence of young Hero, in that he was driving his motorcycle at an excessive rate of speed; that he failed to keep a proper lookout; that he was traveling too close to the neutral ground; and that, if he had swerved his motorcycle to the right, he could have easily avoided contact with the cab. In the alternative, defendants plead the contributory negligence of Hero as a bar to recovery.
Following a trial, the Judge of the district court awarded damages to Andrew Hero in the sum of $3,000 for his personal injuries and his father, William S. Hero, was given $285.55 which represents the medical and other expenses paid by him for the treatment of the injuries. Andrew Hero has answered defendants' appeal, praying that the award in his favor be increased to $3,500.
The accident occurred on the riverside roadway of St. Charles Avenue at its intersection with Foucher Street. St. Charles Avenue, one of the main thoroughfares of New Orleans, is a wide, paved boulevard running parallel to the Mississippi river with two roadways for vehicular traffic which are separated by a neutral ground. This neutral ground is of considerable width and carries two sets of street car tracks over which the New Orleans Public Service operates one of its belt lines. The lakeside roadway of the Avenue accommodates traffic proceeding from Canal Street in the direction of Carrollton Avenue and the riverside roadway is used by traffic travelling towards Canal Street. Foucher Street is one of the many paved streets which intersect St. Charles Avenue at right angles.
Just prior to the accident, the taxicab of defendants had been travelling uptown on the lakeside roadway of St. Charles Avenue. When it reached the intersection of Foucher Street, the cabdriver executed a left-hand turn onto the neutral ground, it being his intention to drive the cab over Foucher Street to the Touro Infirmary, which is located on Prytania Street. However, just after the cab left the neutral ground and had proceeded into the lower or riverside roadway of St. Charles Avenue, its front bumper struck the left side of the motorcycle of young Hero, which was being driven over the riverside roadway of the avenue in the direction of Canal Street and was crossing Foucher Street at approximately the same time at which the cab entered the intersection. The impact caused the motorcycle to be deviated from its course over to the lower riverside corner of the intersection where it came to a stop after it struck the curbing of the street. As a result, young Hero sustained Personal injuries consisting mainly of a broken leg and the usual contusions *Page 889 
and bruises incident to this type of accident.
Plaintiffs contend that the accident is attributable solely to the cabdriver's violation of section 10(b) of article VI of ordinance No. 13702, Commission Council Series (city traffic ordinance) which provides that, on streets and avenues having neutral grounds carrying street car lines, vehicles crossing such neutral grounds shall have the right of way to complete the crossing only on condition that the vehicle "shall come to a full stop when about to leave the neutral ground and enter the roadway, shall signal with horn, and give opportunity for approaching vehicles in the roadway to come to a stop, * * *". Conversely, defendants assert that the cabdriver complied with the above quoted provision and that the accident was due exclusively to the fault of young Hero in that he drove into the intersection at an excessive rate of speed at a time when the taxicab had already preempted it.
The evidence produced by the parties in support of these respective claims is conflicting, as is usually the case in matters of this kind. Young Hero testified that he was driving his motorcycle in the middle of the riverside roadway of St. Charles Avenue at a speed not in excess of 25 miles per hour (30 miles per hour being permitted under the ordinance); that, when he arrived at a point approximately 50 or 60 feet from the corner of Foucher Street, he noticed a taxicab proceeding up the lakeside roadway of the avenue near the intersection of Foucher Street; that, as he progressed and had reached a point 30 feet from the crossing, he again noticed the cab (which he cannot positively swear was the same cab) crossing the neutral ground at a speed of between 10 and 20 miles per hour; that the front of the cab, at the time he noticed it, was coming over the riverside rail of the lakeside street car track; that it was slowing down; that the cabdriver was looking in the direction of his motorcycle; that he (Hero) thought that the cabdriver saw him and that the cab would stop in order to permit the motorcycle to pass in safety. But despite this, says Hero, the cab continued on over the crossing and into his path of travel and that, just as the motorcycle reached the middle of the intersection, it was struck on its left side and rear by the front bumper of the cab.
Hero's testimony with respect to the failure of the cabdriver to stop the cab on the neutral ground before proceeding into the intersection and his failure to blow his horn is corroborated by the statement of one Albert Felix White, who declares that he was standing on the lower riverside corner of St. Charles Avenue and Foucher Street at the time of the accident and also by a colored woman named Hazel Swan, who stated that she was standing on the neutral ground of St. Charles Avenue and Foucher Street looking at the cab at the time it came over the intersection.
The cabdriver, one Cagle, denies that he failed to stop his cab on the neutral ground before he entered the riverside roadway of St. Charles Avenue, although he admits that he neglected to blow his horn, as required by the traffic ordinance. His version of the accident is as follows: That he was proceeding up St. Charles Avenue at a speed of 25 to 30 miles per hour, it being his intention to go to the Touro Infirmary which is situated on Prytanic Street near Foucher Street; that, when he arrived at the corner of Foucher Street, he executed a left-hand turn on to the neutral ground and came to a full stop; that he remained in this stopped position long enough for 12 or 14 automobiles, which were proceeding down St. Charles Avenue, to negotiate the riverside intersection; that, after these automobiles had passed, he put the cab in first gear and started forward into the riverside roadway as he believed that the crossing was clear of traffic; that, just as he did so, he heard the sound of a motorcycle and, looking into the street, he saw Hero approaching on the motorcycle at a distance of 30 feet from the entrance of the intersection; that Hero was coming at a fast rate of speed (40 miles per hour) and was about two feet from the neutral ground side of the roadway; that, confronted with the sudden appearance of the motorcycle, he applied his brakes and brought his cab to an immediate stop at the entrance of the roadway; that the front end of the cab did not extend into the roadway more than 3 feet; that, notwithstanding this, Hero, apparently unaware of the presence of the cab, continued into the intersection at a fast speed and that his left leg made contact with the front bumper of the cab which caused the motorcycle to swerve over to the right and turn over at the *Page 890 
lower riverside curbing of St. Charles Avenue and Foucher Street.
The testimony of the cabdriver is partially corroborated by one Frietag, who is said to be a disinterested witness. Frietag's evidence was taken by deposition and he stated therein that, on the morning of the accident, he was driving his car on Marengo Street near St. Charles Avenue; that, when he reached the avenue, he came to a full stop, it being his intention to turn into the avenue and proceed downtown; that, while he was stopped as aforesaid, a motorcycle travelling on the avenue passed in front of him at a speed of 35 to 40 miles per hour; that, as it passed, he recognized that it was being driven by young Hero, who (he says) was a former classmate at Fortier High School; that he had not seen Hero for a long time and, being desirous of telling him "Hello", he turned into St. Charles Avenue and followed the motorcycle down the street hoping that he would be able to overtake Hero and extend a greeting to him; that he accelerated the speed of his car to 30 miles per hour and that Hero was about a block or a block and a half ahead of him; that, as he reached a point about two blocks or a block and a half from Foucher Street, he saw a yellow cab on the neutral ground of the intersection in a stopped position; that, just at that moment, he saw the motorcycle swerve to the right and fall at the downtown riverside curbing of the intersection, and that, while he did not see the accident, it appeared to him that the cab did not move forward, from its stopped position on the neutral ground, prior to the impact.
There can be no doubt that the cabdriver violated the above quoted provisions of section 10(b) of article VI of the traffic ordinance, as he readily admitted in his testimony that he failed to sound his horn as a warning to oncoming traffic before entering the roadway of St. Charles Avenue. And, while this infraction may be viewed as a minor one and insufficient in many circumstances to support a conclusion of actionable negligence having causal connection with an ensuing accident, it is clear to us that, under the situation presented to Cagle in the instant matter, he could probably have avoided the accident had he obeyed the mandate of the law. Cagle says that he did not see the motorcycle but that he heard it; that the reason why he did not see it was because of the presence of telephone poles, shrubbery and other obstructions situated on the neutral ground which tended to obscure his vision of a small machine, such as a motorcycle. Therefore, it was imperative for him to sound his horn so as to warn any traffic, which might have been approaching the intersection, of his intention to enter the roadway.
But apart from this, we think that the preponderance of evidence warrants a holding that Cagle did not come to a complete stop on the neutral ground as he was required to do by the city ordinance. Hero says that the cabdriver did not stop and he is corroborated in this statement by White and Hazel Swan.
Counsel for defendants attacks the credibility of White and Hazel Swan on the ground that they had given previous statements to the Yellow Cab Company which are at variance with their testimony on the witness stand. The record shows that, when White and Hazel Swan were confronted with the written statements given by them to the cab company, they admitted that they had done so and that the declarations made in the statements were correct. Therefore, we assume that these statements represent a true account of what these witnesses actually observed. But examination of these statements reveal that the defendants can find little comfort from them, inasmuch as White and Hazel Swan declared therein that the cab went over the neutral ground into the roadway without first coming to a stop.
The testimony of the cabdriver that he came to a full stop on the neutral ground stands alone against the contrary evidence given by plaintiffs' witnesses unless we are able to accord full credence to the deposition of Frietag. But, insofar as the latter's evidence is concerned, we feel that his position was so remote from the point where the accident occurred that his statement (that he saw the cab stop on the neutral ground and that it remained in its stopped position when the motorcycle swerved towards the right side of the street) is inaccurate and obviously in discord with the true situation. As a consequence, we conclude that the cabdriver not only failed to blow his horn but that he failed to stop on the neutral ground. That this violation of the city ordinance was highly negligent has been many times decided *Page 891 
by this court. See Breaux v. Cangelosi, 10 La.App. 765, 123 So. 151; Dunbar v. Kaul, 12 La.App. 605, 126 So. 705; Bannon v. Picou, 15 La.App. 511, 132 So. 390; Williams v. Lenfant, 15 La.App. 515, 131 So. 857; Smith's Tutorship v. Perrin, La.App., 145 So. 685 and Ory v. Bosio, La.App., 159 So. 138.
Since we find that the cabdriver was negligent, the remaining question relative to the liability of defendants is whether young Hero was guilty of contributory negligence. The principal charge of the defendants on this feature of the case is that the motorcycle was being operated at a speed of 40 miles per hour. The cabdriver testified that it was being driven at that rate and Frietag says that, when Hero passed in front of him at the corner of Marengo Street (some five or six blocks from the scene of the accident), he judged his speed to be 35 or 40 miles per hour. Hero, on the other hand, declares that the motorcycle was being operated at a speed not exceeding 25 miles per hour and White, one of his witnesses, states that the motorcycle was not travelling at an excessive rate; that it appeared to be about 25 miles per hour or maybe a little faster.
The defendants had the burden of establishing contributory negligence on Hero's part by a preponderance of the evidence. They have failed to carry this burden as we do not feel that the estimations given by their witnesses are sufficient to overcome the testimony to the contrary. Moreover, even if we were of the opinion that the speed of the motorcycle was slightly in excess of the permissive rate of 30 miles per hour, we doubt that its rate of travel had any causal connection with, or contributed to the accident. Hero says that, when he saw the cab, it was slowing down and that he assumed that it would allow him to pass as he had the right of way. Since the ordinance required the cab to stop, Hero was entitled to assume that the law would be obeyed as the speed of the cab was not such as to lead a reasonably prudent driver to believe that it could not be stopped on the neutral ground. See Ory v. Bosio, supra. Hence, it is clear that the sole direct and proximate cause of the accident was the cabdriver's failure to comply with the ordinance and it is obvious to us that, even though it could be said that the speed of the motorcycle was slightly excessive, its rate of travel had no bearing whatever on the result.
Counsel for defendants also contends that the motorcycle was being driven close to the neutral ground in violation of law when it should have been travelling on the right-hand side of the roadway. The cabdriver and Frietag testified that Hero was travelling not over 2 feet from the neutral ground. But Hero denies this charge and maintains that he was approximately in the center of the roadway. White and Hazel Swan support his statement. We not only feel satisfied that defendants have not proved this contention by a preponderance of evidence but, even if we believed that the motorcycle was being driven close to the neutral ground, we fail to see how this would have had causal connection with the accident.
Being of the opinion that the judge of the lower court correctly found that the defendants were liable, we finally consider the quantum of damages awarded to young Hero. He contends that the award should be increased and defendants maintain that it is excessive. According to Dr. Guy A. Caldwell, an orthopedic surgeon who attended Hero, the main injury consisted of a fracture of the lower part of the left leg which involved both bones; the fracture of the larger bone, or tibia, being comminuted and had a small fragment torn away over the principal fracture. Dr. Caldwell says that metal pins were inserted to hold the bones in proper apposition and that, thereafter, plaster was applied around the pins for the proper maintenance of the fragments; that the leg was still not weight-bearing and a second plaster was applied which was worn an additional 4 weeks; that the leg was still not weight-bearing and so a third plaster was applied. Hero was incapacitated for a period of about 7 months from the date of the accident. In addition to the broken leg, he suffered the usual contusions and bruises common to accidents such as this.
The judge of the lower court awarded $3,000 damages for the injuries. A review of the jurisprudence reveals that amounts ranging from $1,500 (see Thomas v. Shippers' Compress Warehouse Co., La.App., 158 So. 859, and Lervick v. White Top Cabs, La.App., 10 So.2d 67) to $2,000 arid $2,500 (see Selby v. Manning, La.App., 145 So. 555; Breaux v. Roussel, La.App., *Page 892 
151 So. 267 and Cato v. City of New Orleans, La.App., 4 So.2d 450) have been allowed by this court for leg fractures where there have been no serious complications and no permanent injuries have resulted. The award in this case is only slightly above the maximum amounts heretofore allowed for similar injuries and, considering the decreased purchasing power of the dollar, we believe that the judgment is proper and that it represents fair compensation under present conditions.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.