This case grows out of a collision between a motorbike ridden by William Lee Gaines, a minor sometimes called Billy, and a truck owned by Milton Williams and driven by the latter's servant Payne Fletcher. Mr. Williams does business as Louisiana Sand and Gravel Company. The collision happened at night.
Mr. Williams was protected from liability for damagers for injuries to persons and property resulting from the ownership, operation or maintenance of the truck by a policy issued to him by Standard Accident Insurance Company, the defendant and appellant. Liability under the policy was limited by its terms to $5,000 for personal injuries suffered by one person and $5,000 for property damage.
Mr. Gaines sued Standard Accident Insurance Company, as the insurer of Mr. Williams, for $5,000 for the use and benefit of his minor son William Lee Gaines for the latter's injuries and $5,000 for himself as damages suffered by him as a result of the accident, with legal interest from judicial demand until paid. Mr. Gaines' individual claim of $5,000 is made up of $150 damages to the motorbike, $1,725.93 which he claimed to have expended in the treatment of Billy for Billy's injuries, and $3,124.07 which he expected to have to expend in future treatment of Billy. He alleged that the future expenses of Billy's future treatment would probably amount to $3,500, but his recovery against the defendant was limited to a total of $5,000 by the policy.
The District Court rendered judgment against the defendant and in favor of Arnold Lee Gaines, individually for $1,364.94, with legal interest thereon from judicial demand until paid, and further against the defendant and in favor of the plaintiff, Arnold Lee Gaines, as administrator of his minor son's estate, in the sum of $3,750, with legal interest thereon from judicial demand until paid.
From that judgment the defendant prosecutes this appeal. The plaintiff has filed an answer to the appeal, in which he prays that the judgment be increased to the full amount sued for.
The facts are gone into in detail in the excellent opinion of the District Judge, the Hon. Carlos G. Spaht, which is as follows:
"This is a suit by the plaintiff, Arnold Lee Gaines, individually for medical, hospital and other expenses, and as administrator of the estate of his minor son, William Lee Gaines, (Billy), sixteen (16) years of age, for personal injuries to said minor son resulting from an accident on the 25th of October, 1946. The accident *Page 635 
occurred when a gravel truck owned by Milton Williams, d/b/a Louisiana Sand and Gravel Company, and being operated at the time by Payne Fletcher, his employee, in the course of his employment, collided with the motor bike on which plaintiff's minor son was riding, at the intersection of Plank Road and Winbourne Avenue in the Third Ward of this parish and state.
"The accident occurred around 11:00 P. M., while Billy was returning home on his motor bike after having attended a high school football game in the LSU stadium. He was traveling northward on the said Plank Road. This road is one of the main arteries of travel between the heavily populated area north of the City of Baton Rouge and the City of Baton Rouge. The road runs slightly northeastward and southwestward but for the purpose of this opinion the road will be described as running north and south. This road is made of a paved slab approximately eighteen (18) feet wide with a black strip running alongside the pavement on each side approximately four (4) feet in width; there is a gravel and dirt shoulder on each side of this black top strip extending to an open ditch on each side of the road and a four (4) foot paved sidewalk on the shoulder just to the east of this open ditch. Winbourne Avenue runs east and west and is a black top road the black top portion being approximately 15 feet in width.
"Billy was very seriously injured in this accident and was still in the hospital at the time of the trial five months after the accident. Plaintiff contends that Billy was proceeding in a northerly direction on his motor bike and at the speed of approximately twenty to twenty five miles an hour, on his right hand side of the road, with the headlight on his motor bike brightly burning, and that the truck driver made a sudden left turn striking his son, just as he was passing the mouth or intersection of Winbourne Avenue. Defendant, on the other hand, contends that the truck driver was not negligent because he stopped before making this left turn, gave the proper hand signal and while keeping a proper lookout, made the turn into Winbourne Avenue as he had a right to do. He further contends that the truck driver had completed his turn before the collision occurred and that the plaintiff's son was traveling northward not on the paved slab of the Plank Road but on the sidewalk which runs along the road on the shoulder approximately twenty two (22) feet eastward and parallel to the paved slab of the road. Defendant, in the alternative, contends that even if the truck driver was negligent then Billy himself was guilty of such contributory negligence as will make it impossible for the plaintiff to recover.
"After listening to the witnesses, viewing the scene of the accident and studying the exhibits this Court has concluded the accident happened as follows:
"That Billy was proceeding northward on the paved slab of the Plank Road near the eastern edge thereof, or on his right hand side of the road, at a speed of approximately twenty to twenty five miles an hour, following rather closely behind another automobile proceeding in the same direction. Fletcher, the truck driver, was, just before the accident, proceeding southward on the Plank Road, and he made a left turn into Winbourne Avenue after the car just ahead of Billy passed the intersection. After he started making his turn and shortly after the front end of his truck cleared the pavement, he struck the motor bike on the left side of the left half of his bumper and left fender and headlight. That Billy realized the truck was coming towards him was going to strike him only shortly before the collision occurred and he turned to his right to avoid the accident and thus was on the shoulder east of the pavement when struck by the left side of the said bumper and headlight of the said truck.
"The Court believes that both the testimony of the witnesses and the physical facts point to this conclusion. Fletcher testified that he stopped and waited for traffic to clear before making this left turn and that after a car passed he started making his left turn. He further testified that another car was coming behind this car approximately a block away. Billy also testified that he was following behind another car which preceded him across the mouth of this intersection. It is evident that the *Page 636 
reason Fletcher did not see Billy on his motor bike was that he was watching the cars, their lights were much brighter and more visible than that of a motor bike would be, and furthermore, since the motor bike was following this car on the right hand side of the pavement, it would not be visible to Fletcher until the car reached the point close to the intersection, and probably not clearly discernable because of the bright headlights of the approaching car until the car had actually reached the intersection. Fletcher was anxious to make this left turn quickly to avoid the on-coming traffic, so naturally he would make the turn as quickly as possible. After the accident the truck stopped at an angle the back end just clearing the paved slab of the Plank Road with the front end just west of the west line of the extension of the sidewalk, which as heretofore described parallels the Plank Road at a distance of twenty-two (22) feet east of the said paved slab on the road. Billy lay five (5) or six (6) feet in front of the truck in the center of Winbourne Avenue and his motorbike was a little north of him and approximately the same distance from the truck. All of this appears clear from the testimony of Fletcher himself, and further from the bloodstains on the pavement, shown by the pictures, as well as the testimony of the other witnesses. Fletcher testified that he was going eight (8) to ten (10) miles an hour when he saw Billy right in front of his truck and realized that an impending accident was going to occur. He then took his foot off the accelerator and applied the brakes. He believes that all of this took a very short time and that after he saw the accident, released his foot from the accelerator, applied the brakes and stopped the truck, his truck traveled only a distance of three (3) to four (4) feet. He may be perfectly sincere in this belief, but the Court knows from personal experience as well as observation, and a study of tables prepared by insurance companies to show the distance required to bring vehicles to a stop under certain speeds that this is not possible.
"These tables indicate that under ideal conditions an automobile may be stopped in five (5) feet after the application of the brakes where the car is traveling at a speed of ten (10) miles an hour. These tables further show that where the driver is suddenly confronted with an emergency, as was Fletcher in this case, that there is a factor known as the Complex Reaction Time. This is the time required for the driver to realize the situation, make a decision and then apply the pressure of the brakes. The time required by various drivers varies considerably all the way from 1/2 a second to 4 or 5 seconds. The average time for an ordinary person is from 1 1/2 to 2 seconds. A vehicle traveling 10 miles per hour is traveling 14.6 ft. per second, thus in this case if Fletcher was considerably above the average it would take him at least a second and he would have traveled 14.6 ft. before he applied the brakes and 5 ft. thereafter or a total of approximately 20 ft.
[1] "Billy and his motorbike were struck with considerable force as is shown by the considerable damage to the motor bike and the truck and the serious physical injuries to Billy himself. If he had been riding on the sidewalk and had been struck with this force he would have ended up several feet east of the sidewalk and the front end of the truck would have certainly traveled beyond the line of the sidewalk. As heretofore shown, the pictures as well as the testimony of Fletcher himself indicate that the front end of the truck stopped before passing the line of the sidewalk and that Billy and his motorbike were only five (5) or six (6) feet in front of the truck, thus, very close to the line of the sidewalk which is four (4) feet in width. These physical facts as well as the testimony of the witnesses eliminate from the mind of this Court all doubt as to where Billy was traveling just before he was struck by the truck. He testified positively that he was on the paved slab, and Fletcher did not testify to the contrary, so the record is barren of either testimony or physical facts that would indicate that he was riding on the sidewalk. The Court has reached this conclusion despite the argument of defendant's able counsel. The fact that it was the left hand side of the bumper which struck the motorbike merely indicates that the truck was at an angle in the intersection *Page 637 
when it struck it. This is further indicated by the fact that if the truck had not been at an angle, the bike going at twenty (20) to twenty-five (25) miles an hour would not have stopped where it did in the middle of. Winbourne Avenue, but would have either struck it a glancing blow and gone on northward, or hit the side of the truck. That the truck was making a turn by cutting across and at an angle is further clearly shown by defendant's exhibit 'd-b-4'.
"Having reached this conclusion the Court is of the opinion that Fletcher is guilty of negligence under the statutory law and the jurisprudence of this state. He failed to keep a proper lookout and to see what he should have seen, and further cut the corner.
"Act 286 of 1938, Section 3, Rule 9(a) Dart's Statutes, 5214, makes it the duty of one making a left turn on highways of this state to yield the right of way to approaching traffic in either direction and not to make the turn unless the way is clear. I quote the following:
" 'The driver of any vehicle on the public roads, highways and bridges of the State shall ascertain, before turning around upon any such road, highway or bridge, that there is no traffic, vehicular or pedestrian, approaching from either direction which will be unduly or unnecessarily delayed and shall yield the right-of-way to such approaching traffic and shall not attempt to make a turn unless and until the said way is clear.'
"In constructing the above statute the appellate courts of this state have held that anyone making a left turn must exercise a high degree of caution before making a left turn. In the event that he collides with traffic in either direction while attempting to make a left turn he is guilty of negligence. Adams v. Golson [La. App.], 171 So. 403; Michiels v. Oser [19 La. App. 24], 139 So. 497; Lane v. Bourgeois [La. App.], 28 So.2d 91; McDonald v. Zurich General Accident Ins. Co. [La. App.], 25 So.2d 923; Dudley v. Surles [La. App.],11 So.2d 70; Hero v. Toye Brothers Yellow Cab Co. [La. App.],19 So.2d 887; Murray v. Kaufman [La. App.], 22 So.2d 750.
[2] "The Court is further of the opinion that Billy was not guilty of any contributory negligence.
"Defendant contends that the headlight on the motor bike was not burning. However, Billy testified positively that the headlight was burning and it was shown by other witnesses that the headlight was burning when Billy was en route to and when he left the First Presbyterian Church on North Boulevard in the City of Baton Rouge. This is where he left his motorbike while in attendance at the game and is possibly two to two and a half miles from the point of the collision. The record is barren of any testimony contradicting the testimony of Billy or the others who testified that the light was burning on Billy's trip to the City of Baton Rouge and when he left the City of Baton Rouge shortly before the accident. Billy was proceeding on his right hand side of the road at a lawful rate of speed. It is true that he did not see this truck until shortly before it struck him. He did, however, notice traffic approaching from the opposite direction, as would any person proceeding up the highway where traffic was heavy in the opposite direction. He had a right to assume that if the driver of the truck was going to turn at that point he would allow him to proceed across the intersection before turning. In other words, the fact that he did not see the truck parked there does not indicate any negligence having any relationship towards the proximate cause of the accident, because even if he had seen the truck was stopped there and had seen the driver with his hand extended, he would still have had the right to assume that the driver was going to obey the law and allow him to proceed across. The cause of this accident was, in this Court's opinion, caused entirely by the negligence of the operator of the truck in failing to see Billy and waiting for him to pass before turning. Counsel for both parties have devoted considerable discussion as to whether or not the truck driver stopped before making the left turn. The driver says that he did stop and wait for traffic. A Mr. Martin, witness for the plaintiff, testified that he was following the truck and that the truck did not stop. In *Page 638 
this Court's opinion it is not material whether or not the truck driver stopped. The cause of the accident was his failure to comply with the express statutory law quoted above which requires the operator of a vehicle wishing to make a turn to ascertain before doing so that such turn will not impede or unduly delay traffic in either direction. Furthermore, as seen by the decisions of the appellate courts of this state, one making a left hand turn is required to exercise a high degree of skill and care to ascertain that such turn can be made safely.
"On the question of quantum the record indicates that Billy was very seriously injured and at the time of the trial five months after the accident was still confined to the hospital and not even able to sit up in bed. His ultimate recovery is still unknown. It is shown that he sustained a compound comminuted fracture of the left femur about two (2) inches above the knee joint, a compound fracture of the left tibia, a fracture of the left fibula, a cerebral concussion, multiple lacerations of the scalp, severe lacerations of the left foot on which the skin was practically evulsed, as well as severe shock. The attending physician estimated that from the date of the trial, if every thing went well, he would be able to walk in some four to nine months and it would be a year thereafter before he attained full efficiency in walking. Billy has been to the operating room approximately ten times at the time of the trial and it is anticipated that he will be required to submit to two or more additional operations. He has undoubtedly suffered a great deal and will continue to suffer for a considerable period. The amount of permanent disability is not known at this time, but with such severe injury there is likelihood of some permanent disability even though Billy is a young man and was in good health prior to the injury.
"The medical and hospital expenses amounted at the time of the trial to approximately $4,000,00. Based on the testimony of the attending physician, the Court believes that there will be approximately another $1,000.00 for medical and hospital expenses.
[3] "The plaintiff contends that although the policy of insurance issued herein by defendant contains a provision limiting liability to $5,000.00 to one person for 'bodily injury liability' that it also contains a provision for $10,000.00 for one accident where more than one person is damaged, thus plaintiff contends that he is entitled to judgment for $5,000.00 in his capacity as administrator of his minor son's estate for the bodily injuries suffered by his son, and he is entitled individually to a judgment for $5,000.00 to cover the medical and hospital expenses resulting from the accident. To sustain his contention in this regard he cites the case of Miller v. Commercial Standard Insurance Company et al. [La. App.], 13 So.2d 740. This case was decided by the Court of Appeals of this Circuit and would be persuasive and controlling were it not for a decision on the point by the Supreme Court of Louisiana handed down in the case of In re Employers' Liability Assurance Corporation, Ltd. [180 La. 406], 156 So. 447, 451. In this case the Supreme Court of Louisiana had before it the interpretation of a liability policy very much like the one before the Court in the present case. After considering the matter thoroughly the Court decided that the meaning of the policy was to limit the liability of the insurance company with respect to the damages resulting to bodily injury or death of one person to the sum of $10,000.00 that amount being analogous to the amount of $5,000.00 in the present policy. The following is quoted from that opinion:
" 'Item 5(a) of the declarations is simply this: "Legal Liability for Bodily Injuries or Death Limit, One Person Ten thousand dollars ($10,000) Limit, One Accident Twenty thousand dollars ($20,000)."
" 'Substituting the word "damages" for "injuries," in the expression "as respects injuries," the language of the policy is paraphrased thus: The corporation's liability as respects damages resulting from bodily injuries or death of one person shall in no event exceed $10,000; and, subject to that limitation for damages resulting from the bodily injuries or death of one person, the total liability on account of any *Page 639 
one accident causing bodily injuries or death to more than one person shall not exceed $20,000. In other words, it is only in the case of "one accident causing bodily injuries or death to more than one person" that the limit of the insurer's liability is increased from $10,000 to $20,000. It is not in the event that more than one person suffers damages, but it is in the event that more than one person suffers "bodily injuries or death," that the limit of the insurer's liability is increased two fold, "on account of any one accident causing bodily injuries or death to more than one person." The language of the policy leaves no doubt about that. The judgment appealed from, therefore, is correct in discharging the Employers' Liability Assurance Corporation from further liability beyond the $10,000 and interest, which the corporation has deposited in court.'
[4] "The Court believes that if it were not for the policy limitations an award of $12,000.00 to $15,000.00 would be proper to compensate Billy for the injuries and pain, suffering and probable permanent disability. Thus, adding this to the amount of medical land hospital expenses there would be a total liability of $20,000.00. Dividing the $5,000.00 between Billy and his father should be on a pro rata basis of 1/4 to the father individually and 3/4 as administrator of his minor son's estate.
"Accordingly, judgment will be signed in favor of the plaintiff, Arnold Lee Gaines, and against the defendant, Standard Accident Insurance Company, individually in the sum of $1,364.94, which is made up of $1,250.00 plus the property damage to the motorbike of $114.94, with legal interest thereon from judicial demand until paid, plus all costs of this suit, and further, in favor of the plaintiff, Arnold Lee Gaines, and against the defendant, Standard Accident Insurance Company, as administrator of his minor son's estate in the sum of $3,750.00."
[5] We approve and adopt that opinion in full except the part about the tables prepared by insurance companies to show the distance required to bring vehicles to a stop under certain speeds and under particular circumstances.
We do not think these tables should have been considered by the District Judge without having been offered in evidence with proof of their accuracy.
[6,7] In deciding a case a Court should not consider a scientific or technical work, treatise or table which has not been admitted in evidence in the case. Such a work, treatise or table should not be admitted in evidence without proof of its accuracy. An instance of the use by the Courts of such a table which had been offered in evidence with proof of its accuracy is found in Hafner Mfg. Co. v. Lieber Lumber Shingle Co.,127 La. 348, 358, 53 So. 646.
However, if the District Judge had not considered those tables we do not believe he would have arrived at any different conclusion from what he did. Certainly, we do not upon a consideration of the evidence as analyzed by him.
[8] Without considering the tables, it is a matter of common knowledge of which he could have, and we do, take judicial notice that when the driver of a motor vehicle is confronted with a sudden emergency some period of time is necessary for him to realize the situation, make a decision and then apply the brakes to his vehicle.
To the District Judge's reasons we add the following reasons of our own for affirming the judgment.
[9] The accident happened while the truck driver, Payne Fletcher, was making a left turn with the truck. A left turn is a very hazardous maneuver. McDonald v. Zurich General Acc. 
Liability Ins. Co., La. App., 2 Cir., 25 So.2d 923, 926; Lane v. Bourgeois, La. App., 1 Cir., 28 So.2d 91, 95. While left turns cannot well be prohibited, as to do so would interfere too greatly with the free movement of motor vehicles, still ordinary prudence requires, a very high degree of care and caution in making them. So, before attempting to make a left turn it is the duty of the driver of a motor vehicle to make sure, as well as he can, that he can make the left turn without danger of an accident. Hubert v. Robichaux, 1 Cir., 8 La. App. 789, 791; Sandoz v. Beridon, La. App., 150 So. 26, 27; Parker v. Employers' Casualty *Page 640 
Company, La. App., 2 Cir., 152 So. 373, 374; Monroe Hardware Co. v. Monroe Transfer Warehouse Co., La. App., 2 Cir., 167 So. 498, 503, 504; Vernon v. Gillham, La. App., 2 Cir., 179 So. 476, 480; Fields v. Owens, La. App., 2 Cir., 186 So. 849, 852; Duke v. Adkins, La. App., 2 Cir., 2 So.2d 526, 528; Woodruff v. Stewart, La. App., 2 Cir., 6 So.2d 796, 798; Dudley v. Surles, La. App., 2 Cir., 11 So.2d 70, 72, 73; Scale v. Stephens, La. App., 1 Cir., 24 So.2d 651, 653; Lane v. Bourgeois, La. App., 1 Cir., 28 So.2d 91, 95, supra; Home Ins. Co. v. Warren, La. App., 1 Cir., 29 So.2d 551, 552; Deffez v. Stephens, La. App., 1 Cir., 30 So.2d 154, 156.
[10] Consequently, when a motorist while making a left hand turn is involved in a collision, it is natural to assume that he must not have been exercising that degree of care and caution which he should have exercised, or the collision would not have happened. So, when a motor vehicle, while engaged in the maneuver of making a left turn, is involved in a collision, there is a presumption that the collision was caused by negligence of its driver.
The evidence shows that Payne Fletcher was engaged in such a maneuver when the collision involved herein happened. The presumption, arising from the fact that he was making a left turn, is that the collision was caused by his negligence. The defendant has not rebutted that presumption.
[11] Counsel for the plaintiff has made a very ingenious argument that judgment can be rendered in favor of Billy for $5,000 for his personal injuries and in favor of Mr. Gaines for another $5,000 for his damages, most of which consists of the cost to him of treating Billy for his injuries, even though liability is by the terms of the policy limited to $5,000 for bodily injury to one person and $5,000 for damage to property. The ingenuity consists in an attempt to demonstrate that the cost to Mr. Gaines of treating Billy for his injuries is a property damage.
In the case of In re Employers' Liability Assur. Corporation,180 La. 406, 156 So. 447, 450, 451, where the policy under consideration was one with a limitation of $10,000 for bodily injury to one person and $20,000 for bodily injuries of several persons in one accident and the injured person was a minor, the Supreme Court held that there could not be a recovery of $10,000 for the minor for her injuries and an additional amount for her father for what he had expended in the treatment of those injuries, but that the total recovery was limited to $10,000.
Counsel seeks to get around the latter decision of the Supreme Court by arguing that Mr. Gaines' claim for the expenses incurred and to be incurred by him in the treatment of Billy for his injuries is not a claim for damages for bodily injuries but a claim for damages to Mr. Gaines' property. The argument made is very ingenious, but we do not think it sound. If Billy had been of age and had paid his own expenses for his treatment, those expenses would have been a part of the damages suffered by him as a result of his bodily injuries, and his claim for reimbursement of those expenses would have been a claim for damages because of his bodily injuries. The mere fact that his father rather than himself incurred and will incur the liability for the expenses because of his minority cannot convert the claim for their reimbursement from a claim for damages for Billy's bodily injuries into a claim for property damage. A claim for reimbursement of expenses paid or incurred in treating a person for bodily injuries is, in our opinion, a claim for damages for his bodily injuries whether those expenses be incurred or paid by him or by someone else, such as his parent or spouse.
For the above reasons the judgment appealed from is correct on the record as it stands.
[12] However, after the case was argued in this Court the defendant, appellant, filed a motion for the remand of the case to the District Court on the ground of newly discovered evidence. The evidence the defendant claims to have discovered is the testimony of one J.L. Campbell, and the defendant annexes to his motion a photostat of a statement by Campbell showing what his testimony would be. According *Page 641 
to the photostat that statement is as follows:
"Baton Rouge, La.
"Oct. 9, 1947
"Statement of J.L. Campbell, age 55 of 3129 Winbourne Ave. Baton Rouge La.
"I am in the trucking business hauling dirt. I have only one truck.
"On Oct. 25, 1946 about 10:30 P.M. I left my home, which is on the north side of Winbourne and fifth house from Plank Road. I was going to tell a negro truck driver to come to work for me the next morning. I was driving my 1941 Ford Coach.
"About 75 feet before reaching Plank Road I saw a cargo north on Plank Road and then a truck headed south on Plank Road turned into Winbourne to go east. Just as the truck was making the turn I saw a motorbike, going north on Plank Road and on the sidewalk come out from behind the pile of concrete block and in front of the truck and the truck and motorbike collided. The truck appeared to be in about the center of Winbourne and the front bumper about halfway the sidewalk.
"I was between 50-75 feet from Plank Road when it happen. The truck was coming in slow and it stopped right where it and the motorbike hit.
"I did not think there was anything to the accident and I was in a hurry to get to the negro as I knew he had planned on going to Port Hudson the next morning. I continued on down my right side of the street and by the truck and went on to town. I had to get off onto the shoulder of the road and the ditch on the east side of Plank Road was partially filled and only one wheel went down in it and I turned and went on South on Plank Road to the negro's house. His name is Percy Smith. I know where he lives but do not know the name of the street or number of the house.
"I was gone about an hour before I returned and there were no cars or trucks at Winbourne and Plank Road. When I reached home my son told me there had been an accident at Winbourne and Plank Road. I told him I had seen it but did not know who it was. My son told me it was Louisiana Sand and Gravel Co. truck. He did not say who was driving it.
"I knew Captain Williams ran the Louisiana Sand Gravel o.
"Several weeks ago I was in Red Griffin's shop and we were talking and he said he was scared every time one of his trucks left out until it got back as he was afraid it might have an accident like Cap. Williams had. I then told Red I saw the accident he had reference to. Several days later I saw Cap. Williams and he ask me about it and I told him I did see it. He then ask me if I would go see the lawyer with him and I did today.
"It was a fair night at the time of the accident and pavement was dry.
"The reason I had not said any thing before about this was that I did not want to become involved and would not be in it now if Red had not said something about it.
"My headlights were in good condition and the truck had good lights too.
"I went to the scene of the accident this morning with Cap. Williams and told him just what I saw.
"I have dictated and had read to me the three pages of this statement and same is true to the best of my knowledge.
(Sgd.) "J.L. Campbell."
We do not think the case should be remanded.
In the first place, the statement which Campbell makes and the circumstances under which he now indicates a willingness to testify are not calculated to be very impressive. The case had been argued and submitted on appeal before he indicated that he knew something about the accident. He made the statement on October 9, 1947, and says in the statement that he was talking to the man in the shop "several weeks ago." We dot not know what he means by several weeks, and there is no explanation as to why he did not make the statement "several weeks" before October 9th. It does not appear when the man Red Griffins told Williams that Campbell had seen the accident. Campbell states that "several days later" (that is after he told Red about seeing the accident) he saw Williams and he asked him about it, *Page 642 
and Williams asked him if he would go and see the lawyer, which he did.
In the second place, the statement of Campbell sounds rather unreasonable to us. He says he passed right by the accident where the evidence shows the Gaines boy was lying on the ground and his motorbike was lying north of the center of the street, yet this man says he passed by on the north side of the street and did not think there was much of an accident. He did not stop, even though a boy was lying on the street seriously injured, and Campbell had to almost pull his car in the ditch to get around the injured boy and his motorbike. If he was so oblivious to the condition existing right by his side as he passed, we hardly see how he could have told whether or not the boy was on the sidewalk or on the street when he was 50 to 75 feet away.
In the third place and as pointed out in the opposition to the remand by counsel for plaintiff, it is strange that neither Fletcher who was driving the Williams truck nor any of the the other witnesses who saw the accident ever saw Campbell pass in a car right by the scene of the accident just after it occurred and almost in the path of the truck which Fletcher was driving.
And in the fourth place in his statement Campbell said "I saw a motorbike, going north on Plank Road and on the sidewalk come out from behind the pile of concrete blocks," and this would be an impossibility in view of Campbell's saying that he was then cast of the Plank Road and the showing by the evidence that the pile of concrete blocks was west of the sidewalk. If the motorbike was on the sidewalk, it and Campbell would have been on the same side of the pile, and Campbell could not have seen the motorbike come out from behind the pile.
The evidence is almost conclusive to the effect that the truck of defendant stopped with its front west of the sidewalk. The west side of the sidewalk is 18 feet from the east side of the pavement on the Plank Road, and the decided preponderance of the evidence is to the effect that the rear end of the truck was near the edge of the pavement, not over 2 feet from it at most. The truck is about 14 feet in length, and it is therefore impossible for the truck to have struck the boy on the sidewalk even though the truck was stopped at once. The boy was lying from 5 to 10 feet in front of the truck, and the evidence shows that he was near the east edge of the sidewalk, and consequently the front of the truck must have been west of the sidewalk when it stopped.
[13] Under Article 906 of the Code of Practice an appellate court should remand a case when the evidence is so unsatisfactory and indefinite as to make it impossible for the court to pass on the case. The court will remand the case if the circumstances indicate that other evidence may be produced to clarify the questions involved. But where the court is in possession of sufficient evidence to decide the case, and the evidence sought to be introduced on a remand could not change the result, there is no occasion for remanding the case. Houghton v. Hall, 177 La. 237, 148 So. 37, 43, 44. Lawsuits must come to an end, and it seems to us that a remand of the case under the showing made by the defendant is not justified. Counsel for plaintiff has indicated that if a remand of the case is had, he has a witness who will be produced to show that Campbell is blind in one eye and near sighted in the other. If the case were remanded, he should be permitted to prove this if he can, and thus there would be an endless chain set in motion.
Therefore, the motion to remand is hereby overruled and the judgment appealed from is hereby affirmed, the defendant to pay all costs in both courts.
DORE, J., recused. *Page 643