79 So.2d 903 (1955)
Mr. and Mrs. Walter FUTRELL
v.
PACIFIC INDEMNITY COMPANY, Selkirk J. Windolph, Ohio Casualty Insurance Company and Mrs. Leroy Harley.
No. 20459.
Court of Appeal of Louisiana, Orleans.
May 9, 1955.
*904 Adams & Reese, New Orleans, for Pacific Indemnity Co., defendant-appellant.
Byrnes & Wallace, New Orleans, for plaintiffs-appellees.
D. E. Cooley, Baton Rouge, L. V. Cooley, Jr., Slidell, and Porteous & Johnson, New Orleans, for Sellmirl J. Windolph (erroneously *905 referred to in the title as Selkirk J. Windolph) and Ohio Cas. Ins. Co., defendants-appellees.
Louis M. Jones, New Orleans, for Mrs. Leroy Harley, defendant-appellee.
McBRIDE, Judge.
This is one of five cases which arose as the result of a head-on collision between two automobiles in which one of the drivers was killed and six persons injured.
The automobiles involved were a Plymouth car driven by Sellmirl J. Windolph and a Dodge car owned by Mrs. Leroy Harley and driven by her husband, Leroy Harley. The accident occurred about 3:00 a. m., on July 5, 1953, at a slight but exceedingly dangerous S curve on Highway 11 in the town of Slidell, Louisiana. The record shows that at this particular point many accidents have happened in the past, some with tragic results. The nature of the curve, which is graphically shown on photographs and diagrams which form part of the evidence, is such that the northbound traffic lane of Highway 11 if projected straight through and across the slight curve will enter and coincide with the southbound traffic lane on the other side of the curve. As between the two straightaways the curve amounts to an offset of about ten feet.
Five lawsuits in all resulted from the unfortunate accident, and in this opinion we will confine ourselves to the suit in which Mr. and Mrs. Walter Futrell are plaintiffs as that was the first of the suits docketed here. Said plaintiffs were riding as guest passengers and were stated in the rear of the Harley automobile; Mrs. Futrell occupied the middle portion of the rear seat and her husband sat to her left. Mr. and Mrs. Futrell direct their joint suit against Pacific Indemnity Company, Sellmirl J. Windolph, Ohio Casualty Insurance Company, and Leroy Harley, in solido. Mrs. Futrell claims $6,500 for her bodily injuries, disfigurement and loss of earnings; her husband claims $7,100 for his personal injuries.
Pacific Indemnity Company is the liability insurer of the Harley car; the policy stands in the name of Mrs. Harley. Ohio Casualty Insurance Company carries the liability coverage on the automobile which was driven by Sellmirl J. Windolph. The policies issued by the two insurers contain the standard provisions pertaining to automobile liability with limits of $5,000 for injuries to any one person and $10,000 for injuries to two or more persons sustained in one accident, and $5,000 property damage.
The five suits were consolidated for the purpose of facilitating a trial, which was had before a jury, and the evidence adduced was made applicable to all; the trial resulted in separate jury verdicts and judgments in the five suits in favor of the six plaintiffs and against Pacific Indemnity Company alone.
The award of the jury in favor of Walter Futrell was $300; the verdict in favor of Mrs. Futrell was for $250. Plaintiffs" suit as against all the other defendants was dismissed, and Pacific Indemnity Company prosecutes this appeal from the judgment insofar as it runs in plaintiffs' favor and also as "third party aggrieved" insofar as the judgment dismisses the suit against Ohio Casualty Insurance Company. See Reid v. Monticello, 215 La. 444, 40 So.2d 814. In an answer to the appeal, both plaintiffs pray that the judgment dismissing the suit as against Ohio Casualty Insurance Company be reversed and that the amounts of the judgment be increased so as to allow Walter Futrell $500 and Mrs. Futrell $750. Of course, the answer to the appeal would be insufficient to bring Ohio Casualty Insurance Company into this court. Where a plaintiff's suit is dismissed as to one defendant the plaintiff's answer to the appeal taken by another defendant cannot serve the purpose of an appeal with respect to bringing into court parties against whom the suit has been dismissed. Succession of Jackson, La.App., 77 So.2d 194.
At this point it would do well to state that the aggregate amount of the *906 judgments recovered by the plaintiffs in the five consolidated suits was $47,675 and the $10,000 maximum liability of Pacific Indemnity Company was prorated between the parties. The amount of Walter Futrell's judgment was $300, and in the proration the trial judge allowed him 300/47675 of $10,000 or $62.92; Mrs. Futrell's judgment was for $250, and the trial judge allowed her $52.44 or 250/47675 of $10,000. The formula used for the purpose of making the proration was the correct one. See Gaines v. Standard Acc. Ins. Co., La.App., 32 So.2d 633.
Five persons in all were riding in the Harley automobile; besides Mr. and Mrs. Walter Futrell, Mrs. Leroy Harley who owned the automobile was seated in the front of the car alongside her husband who did the driving, and John S. Futrell occupied a place on the right side of the rear seat. Harley was driving the automobile in the direction of New Orleans. The other automobile involved in the collision, the one driven by Windolph, was proceeding in the opposite direction, or, in other words, it was traveling away from New Orleans and toward Pearl River. There was also a passenger in Windolph's car, namely, Jerry Anthony Whitfield, who was seated alongside Windolph.
Exactly where the accident happened with respect to the curve in the road is a point which is controverted. It is argued by some counsel that the automobiles came into collision within the curve, but a careful reading and sifting of the evidence convinces us that the accident did not take place within the curve at all but that the vehicles came together a few feet from the curve and before the Windolph automobile had reached it.
The charges and countercharges of negligence leveled against both of the drivers are numerous and need not be detailed, but we may mention that the respective drivers are said to have been speeding and that they each failed to keep a proper lookout. It is also specifically alleged that both Harley and Windolph were under the influence of liquor.
The evidence shows that the Futrell brothers and Leroy Harley are merchant seamen, and that on July 4 Harley arrived in port at New Orleans. About 10 o'clock p.m., his wife and the three Futrells left New Orleans in the Harley car with the intention of driving to Pearl River. En route, the parties stopped off at Bosco's Place at Slidell and remained there for approximately an hour and a half, after which the journey to Pearl River was completed. Throughout the trial the witnesses were questioned closely as to whether Harley had been drinking prior to the accident. Mrs. Harley testified that the only liquid consumed by her husband was a certain well-known soft drink, but her testimony is sharply contradicted by the Town Marshal of Pearl River who stated in his direct examination that he saw Harley drinking in Jerry's Bar and that his opinion of Harley was that he was "feeling the effects of the alcohol." The Marshal based this opinion on the fact that Harley was boisterous, or as the Marshal stated, "was talking a little loud." John S. Futrell also contradicts Mrs. Harley for he states that at Bosco's, while he danced and had some food, the other persons ordered beer but that he did not know how many "rounds" were served. John S. Futrell also states that at Jerry's at Pearl River he consumed a soft drink and danced while the other members of the party sat at a table. He mentioned that he knew of one round of beer having been ordered by his companions and that he presumed they were drinking but he remarked: "I didn't keep a count of what was drunk."
The strongest testimony that Harley was drunk came from the Town Marshal, but his testimony is considerably weakened by his admission on cross-examination that he conversed with Harley and that the latter "talked sensibly." The subject of the conversation between the two men was the Marshal's son who was away on a merchant marine ship and who was known by Harley.
To prove that one is incapable of operating a motor vehicle, it need not be shown that he was drunk but only that he had a sufficient quantity of intoxicants *907 to make him lose normal control of his mental and physical faculties and cause such faculties to be materially impaired. See Elba v. Thomas, La.App., 59 So.2d 732. The evidence is insufficient to lead us to the belief that Harley's condition was such that he was incapable of operating his automobile with safety.
It is argued to us that whereas Harley is a seaman, we should take judicial cognizance that when he arrived in port he arrived with an awful thirst and that the probabilities were that he imbibed too freely, but we are unwilling to accept that as a fact without supporting proof. There is no reason known to us why a seaman should be singled out for placement in any such special category. We do not know that a seafarer arriving in port has any more of a propensity for consuming liquor than persons in other occupations who always remain in port.
Nor does the record show that on the night in question Windolph was intoxicated to any extent. It appears that he picked up his friend, Whitfield, at his home in Slidell about 8:30 p.m. on July 4, 1953, and between that time and 2:30 a.m. of July 5, 1953, Windolph and Whitfield rode about the town and visited three establishments where they met and conversed with friends. The two men admit that they drank three or four beers during the course of the night, but the evidence is convincing that neither ever lost sobriety; this appears from the testimony of several persons who saw them at various times during the night in question. The last place visited by the two was Bosco's where Windolph partook of a sandwich and drank coffee. He drove away from Bosco's at 2:30 a.m. to take Whitfield home and it was on this trip the accident happened.
The Harley automobile with Leroy Harley at the wheel and with the other persons already mentioned seated in the car as passengers left Jerry's Bar at Pearl River about 2:40 a. m. and the accident occurred just about twenty minutes later.
Walter Futrell claims he knows nothing regarding the details of the accident and testified that just before it happened he "slid down the seat" and from his position could see nothing. Mrs. Walter Futrell was sleeping. John S. Futrell likewise knows nothing and when asked what was the location of the Harley car with respect to the middle line in the road replied: "I didn't observe anything." Walter Futrell, however, states that before he "slid down the seat" he noticed that the two automobiles were moving straight toward each other and he asked Harley: "Roy, are you on your right side?" Harley's answer was: "Sure I am." Walter Futrell's apprehension of the position of the Harley car with respect to the stripe dividing the roadways leads us to the conclusion that Harley was not on the right side of the road. If there is any doubt of the correctness of this conclusion, this would be dispelled by the directions which Mrs. Harley says she gave to her husband; she testified she told him to "pull over, pull over."
Whitfield also claims that he does not know what may have been the cause of the accident, his testimony being to the effect that he did not see anything because he was turned sideways looking at and talking to Windolph.
Windolph makes the statement that he saw the Harley car when it was between 400 and 600 feet away and that it was coming at a rapid rate of speed. He insists that the Harley car came a few feet over the center line and into the lane in which he was driving and that this was the cause of the collision, Windolph states that he attempted to avoid the collision by swerving his car slightly to his right and partly onto an eight-foot paved shoulder in the road.
There were no other eyewitnesses to the accident; however, immediately after the crash a crowd congregated at the scene and some of those who were present appeared as witnesses in the case. The consensus of the testimony of these bystanders given at the trial was that after the accident the Windolph car was well over on its proper side of the road and some of the witnesses *908 corroborated Windolph's statement that the car was partly on the right shoulder. The Harley vehicle was partly over to the left or on Windolph's side of the road.
Much of the testimony concerns the speed at which the two automobiles were traveling. It is agreed by all counsel that the local speed regulations governing the town of Slidell establish 30 miles an hour as the allowable maximum of vehicular speed. Whitfield testified that Windolph was driving at about 30 miles an hour but he was confronted with a written statement which he had previously given to an insurance adjuster that Windolph had been traveling at 35 miles an hour. The witness seemed to remember nothing about the statement and insisted that his testimony that Windolph's speed was 30 miles an hour was correct. Windolph is positive that he was not exceeding the speed limit and made the statement that he had looked at his speedometer shortly before the accident and that his speed was exactly 30 miles an hour. There is nothing in the testimony from which it might be concluded that Windolph's automobile was traveling at an excessive or unlawful rate of speed, but even assuming that his speed was 35 miles an hour, which information Whitfield gave the insurance adjuster, we do not believe that the slight excess over the lawful rate of speed had anything whatever to do with the accident.
When the Harley automobile had completed traversing the viaduct between Pearl River and Slidell it was traveling, according to Mrs. Harley, "40 or 45 or maybe 50." Upon the request of one of the Futrells that the speed be reduced, it seems that Harley did diminish his speed, but, notwithstanding that, we believe that Harley continued to exceed the speed limit to some extent in driving throught the town of Slidell. A witness named Gomez states that he visited John Futrell at the Charity Hospital after the accident and that Futrell told him that Harley was "going pretty fast." Futrell also stated to Gomez that when he asked Harley to slow down that Harley reduced his speed to 50 miles an hour. Another witness named Levy also visited one of the Futrells at the hospital and was told that Harley had been "going fast" and that when Harley was asked to slow down he reduced his speed "a bit."
There is some contention made by the Futrells and Mrs. Harley that Harley was blinded by the unusually bright lights on the Windolph automobile, a spotlight being alluded to by some of the witnesses as the offending agent. Windolph vehemently denies that he was driving with bright lights or with the spotlight turned on. We are of the firm belief that the testimony of the Futrells and Mrs. Harley respecting blinding headlights on the Windolph automobile is nothing more than an afterthought and that the condition of the lights on Windolph's car had not even the remotest connection with the accident. Gomez, who has been mentioned before, was riding on the front seat of an automobile with Manuel McCoy, and this automobile was following and traveling in the same direction as was the Harley automobile. Both Gomez and McCoy state that they observed the lights on Windolph's car coming toward them before the accident and that the lights were dimmed. Surely if these witnesses faced the Windolph automobile they would have noticed it if Windolph's lights were unusually bright or interfered with their forward vision. Gomez also stated that when he saw John Futrell at the Charity Hospital and asked him how the accident happened, Futrell said absolutely nothing about Windolph's automobile having had blinding headlights. Neither did John Futrell make any mention in the written statement which he gave to the insurance adjuster that Windolph's headlights were sufficient to affect the vision of the occupants of the Harley car. It might also be observed that none of the plaintiffs, with the exception of Mrs. Harley, made any allegation in their pleadings that the lights of the Windolph vehicle blinded the driver of the Harley car.
Thus stands the record, and after carefully analyzing and sifting all of the evidence and the circumstances surrounding the accident, there is only one conclusion *909 that may be drawn and that is that the accident was caused solely through the fault of Harley who was at the wheel of his wife's automobile. There is not the slightest doubt of his having been negligent. Instead of driving into the slight S curve, it would appear that he steered his car straight across the curve which had the effect of placing his vehicle, which had been traveling in the southbound lane, partly over onto the northbound lane which was being traversed by the Windolph automobile coming from the opposite direction. The fact that two of his passengers warned Harley to "pull over" to his right lends support to our conclusion. Not only that, but the positions of the respective vehicles after the accident eloquently attest the fact that Harley's automobile was partly in the northbound lane. Whatever was the reason for Harley failing to negotiate the S curve will never be known; but we do know that he traveled through the town of Slidell at an excessive rate of speed, and, perhaps, this caused him to fail to make the curve. On the other hand, we find nothing in the record which could be the predicate for a holding that Windolph was guilty of negligence or that any action or nonaction on his part had anything to do with the accident.
Mr. and Mrs. Walter Futrell, John Futrell, and Mrs. Harley are charged by the Pacific Indemnity Company with having been guilty of contributory negligence, the plea being that they were on a joint mission or enterprise with Leroy Harley and that each had an equal right of control of the Harley automobile and that they acquiesced in Harley's negligent operation of the car. It is argued that under these circumstances and in line with the jurisprudence of this state the said plaintiffs are barred from recovering for their damages. We do not believe that any of these plaintiffs were guilty of contributory negligence; contrary to the contention of Pacific Indemnity Company, they were not on a joint mission with Harley but were passengers in his automobile. It does not appear that they acquiesced in any reckless driving on the part of Harley for as has been mentioned several times herein they requested Harley to reduce the speed of the car and two of them warned Harley to "pull over" and drive his vehicle on the proper side of the roadway. They had no reason whatever to anticipate that Harley would fail to make the S curve and, of course, they cannot be said to have acquiesced in this course of action on Harley's part.
The jury undoubtedly entertained the same views that we do else the respective plaintiffs would not have recovered damages only as against the Pacific Indemnity Company which is the insurer of the Harley automobile. But even if we entertained doubt as to the soundness of our views we would be inclined to concur in the findings of the jury as to liability, as it has been repeatedly held that a jury's finding of fact when approved by the trial judge will not be disturbed unless it appears that the finding was manifestly erroneous. Beattie v. Dimitry, 162 La. 571, 110 So. 759; Matthews v. New Orleans Terminal Co., La.App., 45 So.2d 547.
None of the plaintiffs produced the attending physicians or any medical experts who could testify as to their injuries; however, a certified photostatic copy of the Charity Hospital chart pertaining to Mrs. Harley was introduced in evidence, and this, of course, makes prima facie proof of its contents. LSA-R.S. 13:3714. Written statements from three physicians were placed in evidence by agreement of counsel and these pertain to Whitfield's injuries. The only testimonial evidence we have bearing on the question of injuries is the testimony of the various plaintiffs. This court has held that a plaintiff who fails to produce the evidence of physicians as to personal injuries is nevertheless entitled to be compensated for the injuries if he can otherwise show the nature thereof. Cade v. Tafaro, La.App., 34 So.2d 72; Anderson v. Morgan City Canning Co., La. App., 73 So.2d 196. But sight cannot be lost of the fact that plaintiffs almost invariably attempt to exaggerate their injuries. We also recognize there is no rulor *910 standard by which awards for personal injuries may be measured and much discretion is vested in the court in a personal injury action in assessing damages.
Walter Futrell says he sustained a slight concussion of the brain, laceration under the left eye, and bruises and contusions of two ribs. The ribs were strapped for four days and a plastic bandage was applied for an additional five days. Futrell's upper left central and lateral incisor tooth was knocked loose and later had to be removed. Futrell was able to leave New Orleans on his ship five days after the accident. The jury fixed Futrell's damages at $300, but in our opinion that amount is wholly inadequate especially in view of the loss of the tooth, and we believe it should be increased to the sum of $500 which is the amount prayed for in Futrell's answer to the appeal. However, in the proration of the $10,000, due to a revision of the various judgments, the denominator has been changed from 47675 to 33300. Therefore, said plaintiff will be entitled to receive in the proration of the $10,000 liability of Pacific Indemnity Company 500/33300 or $150.15.
Mrs. Futrell claims to have sustained a contusion of the left temple with abrasions to both shins as well as bruises and contusions about the body and legs. She also sustained a laceration approximately 2½ centimeters long about midway between the left knee and left ankle. She claims that she sustained a concussion of the brain and suffered from headaches periodically for several weeks after the accident. We believe that the verdict and judgment in her favor for $250 should be increased to $500. Therefore, her share of the $10,000 for which Pacific Indemnity Company is liable would be 500/33300 or $150.15.
It is ordered, adjudged and decreed that the judgment appealed from be amended so as to increase the award to each plaintiff to 500/33300 of $10,000 or for $150.15 and affirmed.
Amended and affirmed.