The intersectional collision from which this litigation results took place at the corner of Howard Avenue and Camp Street, in the City of New Orleans, at about 1:30 o'clock in the early morning of Sunday, December 21, 1946. The two vehicles which were involved were a Chrysler taxicab, going in a downtown direction on Camp Street, and a Ford Tudor Sedan of plaintiff, going in Howard Avenue towards the Mississippi River. The taxicab struck the Ford on the right side. The Ford was turned over and both cars were severely damaged.
Paul V. Pancoast, the owner of the Ford, brought this suit in the Civil District Court for the Parish of Orleans, alleging that the accident was caused solely by the negligence of the operator of the taxicab. He alleged that $600 was the depreciation in value of the Ford resulting from the damage sustained and he prayed for judgment for this amount against John D. Byrnes, the owner of the taxicab, James Martin, the driver whose correct name later was shown to be Eugene Sola, and Cooperative Cab Company, which corporation plaintiff alleged had "posted and furnished bond as required by law for the protection of any person, including petitioner, who may be damaged or injured by the operation of United Cab Company taxicabs, including the taxicab in this case, * * *."
The three defendants answered, admitting the occurrence of the accident and that at the time the driver of the taxicab was operating it in the course of business and that it was owned by Byrnes and was bonded or insured by Cooperative Cab Company. Defendants denied that the driver of the taxicab was in any way at fault and averred that, on the contrary, the driver of plaintiff's Ford, his son, Paul V. Pancoast, Jr., was entirely at fault. And, in the alternative, that it should appear that the driver of the taxicab was in any way negligent, then defendants especially pleaded the contributory negligence of the said Paul V. Pancoast, Jr.
One of the defendants, John D. Byrnes, the owner of the taxicab, then assumed the position of plaintiff in reconvention, and, alleging that the accident had resulted solely from the negligence of plaintiff's son, Paul V. Pancoast, Jr., and that the said son at the time was operating the Ford with the full knowledge and consent of Paul V. Pancoast, Sr. and "for their joint use and benefit" and that the cost of repairing the damage sustained by the taxicab amounted to $425, prayed for judgment in reconvention for that amount against Paul V. Pancoast, the owner of the Ford and plaintiff in the main demand, and Paul V. Pancoast, Jr., who was operating it at the time of the accident.
After a trial on the merits, judgment was rendered for plaintiff as prayed for in the sum of $600 against defendants, John D. Byrnes, James Martin and Cooperative Cab Co., in solido, and the reconventional demand was dismissed. All of the defendants have appealed.
During the course of the trial in the District Court counsel for Paul V. Pancoast, *Page 454 
Jr., objected to the introduction of any evidence which might be produced or relied upon to show liability in reconvention in him. This objection was based on the ground that since Paul V. Pancoast, Jr., was not a party plaintiff, he could not be made a party defendant in the reconventional demand. Counsel for Paul V. Pancoast, Sr., at the same time, objected to the introduction of any evidence tending to show liability in him for any negligence of his minor son, in the event that it should be contended that that liability resulted from the fact that his son at the time of the occurrence was a minor residing with his father.
This objection was directed at the fact that the petition in reconvention contains no allegations of fact on which can be based the legal conclusion that Pancoast, Sr., could be held liable for the negligence of his minor son residing with him, the sole allegation as to the reason for imputing the negligence of Pancoast, Jr., to Pancoast, Sr., being that the son was operating the car of the father for their joint use and benefit.
The district judge ruled that Paul V. Pancoast, Jr., could not be made a defendant in reconvention since he was not a plaintiff in the main demand and he overruled the other objection saying:
"* * * I will overrule the other objection. It may be you have alleged only a joint venture; but in the absence of surprise, I think in the interest of justice it would require I permit you to amend and to attempt to hold the plaintiff on the theory it was his minor son residing with him, if you can, in the interest of saving a multiplicity of suits; otherwise I would have to nonsuit the whole reconventional demand."
Counsel for plaintiff said:
"We are not surprised, I had anticipated it, and I don't want any delay.
"I do reassert our position is correct, that they can not amend; I believe it is changing the issue and seeking to hold the father responsible on a different basis than what they allege."
Whereupon counsel for plaintiff in reconvention said: "I move to make that amendment" and counsel for plaintiff and defendant in reconvention said: "My objection goes to the amendment, on the basis of changing the issue," whereupon the district judge said:
"* * * with the liberal view taken today with respect to pleadings, in order that every man may have his day in court, I think in the absense of surprise, or a situation that would cause a miscarriage of justice, I am authorized to permit the defendant to so amend his pleadings as to include the other cause of action."
Before considering and discussing the legal questions presented by those objections, we shall first consider the facts in an effort to determine which of the operators was at fault or whether the negligence of both contributed to the result.
The intersection is a very dangerous one. Howard Avenue at that point is a one-way street, used only by vehicles going towards the Mississippi River and Camp Street is a one-way main thoroughfare for vehicles going in a downtown direction. Located on the sidewalk on each side of Howard Avenue is a "stop" sign, so that as the Ford of plaintiff reached the intersection, it was confronted by two of these stop signs, one to its right, the other to its left. On the corner which intervened between the two vehicles there is a large modern building which extends to the property line of both streets, so that each vehicle was completely screened from the view of the operator of the other until the vehicle on Howard Avenue emerged beyond the property line and had partially entered the intersection of Camp Street.
So far as the right-of-way is concerned, it is conceded that this — if the vehicles entered the intersection at about the same time — would have been with the taxicab on Camp Street because it approached from the right side of the other vehicle. The applicable City Ordinance No. 13702 C.C.S., provides in Article V, section 15, subparagraph (a), that:
"When two vehicles enter an intersection at the same time the driver of the vehicle on the left shall yield to the driver on the right." *Page 455 
Defendants rely on this provision and maintain that because of it the taxicab was entitled to the right of way, while plaintiff asserts that his son was entitled to the right of way because, so he declares, the Ford had entered first and had preempted the intersection. He relies on the first sentence of that same subparagraph (a), which reads as follows:
"The operator of a vehicle approaching an intersection shall yield the right-of-way to a vehicle which has entered the intersection."
It is obvious then that though the taxicab was entitled to the right of way if the cars entered the intersection at about the same time, it lost this right if the other vehicle entered sufficiently in advance to entitle its operator to claim that it had preempted the intersection.
The accident occurred at about 1:30 A.M. in the morning on Sunday and the driver of the Ford was home from college for the Christmas holidays. There were four young men in the Ford and they had been to various night clubs or places of entertainment, and it is contended that these and other facts indicate that the young men had been drinking. While it is true that these circumstances might indicate that the boys had indulged in such pastime, there is no positive evidence which shows that they — particularly young Pancoast, the driver, who says that he had not been drinking at all — were to any extent under the influence of liquor.
These four young men all declared that when they reached the stop sign and before their car entered the intersection, it was brought to a complete stop. Young Pancoast, who was at the wheel, and James Lanigan, who was on the front seat with him, both say that when the Ford was brought to a stop, they looked up Camp Street and saw one automobile coming down Camp Street. Lanigan says: "It didn't seem to be coming pretty fast when I first saw it." They both say that this other vehicle was about three-quarters of a block up the street and that they thought they could easily pass. They say that they were almost across Camp Street when the other vehicle, which according to them had been coming at a terrific speed, crashed into the side of their car. The other two young men, who were in the rear, were Paul Timothy and John G. Smith, and while they both say that the Ford stopped at the stop sign, they do not claim to have seen the other automobile as they were talking at the time.
The only other eye-witnesses were James Martin, the driver of the taxicab, Peter Veroni, a passenger seated on the front seat of the taxicab, and Harold Crumpler who was operating a taxicab of the Toye Bros. Yellow Cab Company about seventy-five feet behind the cab which was involved in the accident. These witnesses all state that the taxicab was going down Camp Street at a moderate speed. Crumpler, driving the other cab, says that he did not see the Ford as it emerged into Camp Street, but that he saw the other cab swerve suddenly to the right and then saw that there was a Ford which it was about to strike. Martin and Veroni both say that just before the taxicab reached the intersection the Ford, at high speed, darted out into the intersection and directly into the path of the oncoming taxicab. Martin, the driver says:
"* * * this car came out without stopping, and he wasn't going slow, either."
Veroni, the passenger, says:
"* * * we were going around, I imagine, close to 20, and as we hit the intersection, entered the intersection, that black Ford shot out in front of the cab. That was without warning."
Crumpler, referring to the Ford, says:
"* * * it was so quick, the car must have been moving at a good rate of speed."
All witnesses say that the taxicab was swerved suddenly to the right, but that it could not avoid hitting the Ford which was crossing in front of it.
The Ford was knocked sideways into a large post on the sidewalk on the lower, river corner of the intersection. Its left side was severely damaged by contact with this post, and it then proceeded on for about ten feet or more towards the river and turned completely over and came to rest with its wheels in the air, and with its front end pointing back towards Camp *Page 456 
Street. After the Ford struck and went by the large post, the taxicab crashed into the same post and badly damaged its bumper, its front grill and motor. This impact was so severe that the taxicab became enmeshed with the post to such an extent that another taxicab which came up had difficulty in pulling it loose.
There is considerable disagreement over the question of whether the taxicab was being driven on the left side of Camp Street as it approached the intersection. All of the witnesses for plaintiff say that it was on the right side of the center and it is argued from this that since the impact must have taken place near the river side of Camp Street, the Ford of plaintiff had not only entered the intersection first but had almost completely crossed it before the taxicab entered and that therefore, by preemption, the Ford had obtained the right of way. On behalf of defendants, on the other hand, it is asserted that the taxicab was in a lane to the left of the center of Camp Street as the Ford emerged and that it was only after it swerved suddenly to its right that it crossed the center line of the street.
If we were to confine ourselves solely to the oral evidence, no other conclusion could be reached than that the taxicab was on the righthand side of Camp Street at all times, for even the driver of the taxicab, obviously confused, said that when the Ford was struck "nearly all" of it had crossed Camp Street.
However, we reach a different conclusion after carefully weighing all of the testimony and studying all of the physical facts. If the Ford, moving even slowly towards the river, had partially left the intersection when it was struck by the taxicab after the latter vehicle had turned sharply to its right, the only possible result would have been for the taxicab to have turned into or to have been pulled into Howard Avenue. It could not have continued in a more or less downtown direction and gone no further to its right than the post on the downtown river corner of the intersection. The location of the skid marks, the position of the two cars after the accident, and other facts convince us beyond any possible doubt that the taxicab was in the lane slightly to the left of the center line when the Ford emerged and that it was in an effort to avoid striking the Ford that the driver of the taxicab swerved it sharply to the right. This swerve changed its course towards the downtown river corner of the intersection, but not sufficiently to avoid the Ford which was passing in front of it, the result being that it struck the Ford and knocked its rear end towards the post. The Ford, obviously at a substantial speed, after striking the post, continued on in the general direction in which it had been going, turned over, reversed itself and came to rest with its four wheels in the air.
From these facts it is obvious that it can not be said that the Ford of plaintiff, as a result of having entered the intersection first, had obtained the right of way by preemption. We repeat here what we said in Sheehan v. Hanson-Flotte Co., La. App., 34 So.2d 657, 660:
"When we use the word 'preempt' we do not attribute to it the meaning which counsel for plaintiffs seem to understand that it has. It does not mean that, where one vehicle, by traveling at an excessive rate of speed, is able to enter the intersection when the other which is approaching it is still a few feet away, the first has preempted the intersection and is entitled to cross regardless of what may otherwise have been the right of way. It does not mean that two drivers may race to see which can enter first and that then the one who does enter first may say that he has established his preemption. It merely means that if two vehicles approach an intersection at proper speeds and with the exercise of ordinary precautions and yet one enters sufficiently in advance of the other to justify the belief that it may continue across without danger, it may do so regardless of the fact that the other has approached from the right and would have had the right of way but for the advance position of the first."
There is no doubt that the taxicab skidded a distance estimated by various witnesses at from 21 to 30 feet before it struck the Ford, and that even after this skidding *Page 457 
it was still moving with considerable momentum as it struck the Ford such a severe blow that it not only crushed the right side of the body of the Ford, but also bent the chasis and knocked it sideways into the post. On the other hand, we can reach no other conclusion than that the Ford too entered the intersection at a speed higher than was justified by the surrounding circumstances and by the fact that the other vehicle was entitled to the right of way. We are certain that it entered the intersection at a speed higher than would have been possible had it actually stopped at the stop sign to its right. Even had it been struck after it had almost completed the crossing of the intersection as counsel for plaintiff insists that it was, we cannot believe that it could have been struck so hard that it was pulled sideways ten or twelve feet into the post and then knocked forward ten or fifteen feet more, unless its own speed in the forward direction was more than it should have been.
Then, too, the evidence of the two young men in the front seat as to the alleged stopping at the stop sign strains our credulity to the breaking point. Young Pancoast says that after stopping he shifted into first gear, looked carefully up Camp Street, saw one car approaching at a distance of about three-quarters of a block, and then slowly crossed the street, and that he did not see the taxicab again until "he suddenly saw the lights, awful close." Lanigan goes even further and says that he knew that the corner was very dangerous, was afraid that the stop sign might have been knocked down, and therefore warned Pancoast before reaching the corner to be very careful and to be sure to stop at that corner. If these precautions were actually taken, there would have been no accident regardless of the speed of the taxicab or the carelessness of its driver.
In Glen Falls Ins. Co. v. Copeland, La. App., 28 So.2d 145, 147, the Court of Appeal, Second Circuit, said:
"A motorist, before attempting to cross a right of way street, is legally required to bring his own car to a complete stop on the less favored street so that he may observe traffic conditions in both directions. It has often been held that for a motorist to merely stop before attempting to enter a right of way street, he performs only one-half the duty that rests upon him. To stop and then proceed forward without having sufficient opportunity to determine if it is safe to do so, is negligence of a gross character, and renders the person guilty of such responsible for damages resulting therefrom."
Similarly, in Arline v. Alexander, La. App., 2 So.2d 710, 712, the same Court of Appeal made the following statement:
"* * * To stop before entering a right-of-way street but discharges half the duty imposed upon a motorist. This action must be followed by careful observance of traffic conditions on the right-of-way street and no entry thereon made unless conditions clearly warrant it. To fail to see what may be seen in such circumstances on casual inspection amounts to gross negligence, and loss or injury arising from such failure falls upon the guilty person or persons."
And in Goff v. Southern Coffee Mills, La. App., 144 So. 513, 514, appears the following:
"On the upper river corner, which was the corner over which, had there been no obstruction to the view, either driver could, had he looked, have seen the other vehicle approaching, there was a large wooden building, which extended to the property line of both streets. This placed upon the drivers, particularly on the one who did not have the right of way, the duty of exercising extraordinary care before emerging into the intersection. Though there is some conflict in the evidence, we believe that it conclusively appears that Goff did not stop and did not look at a point from which he could have seen the truck approaching. Had he done so, it is inconceivable that he would have driven into the path of the oncoming truck. It may be that the truck was approaching at a speed in excess of that permitted by law, though the evidence on this point is clearly with the defendant, nevertheless, unless the speed was greatly in excess of the legal limit, Goff, had he looked *Page 458 
and had he seen the truck coming, would have realized the danger of emerging from his position of safety."
As to the duty in such situation, to attempt to determine within reasonable bounds just how fast the car on the other street is approaching, in Smith's Tutorship v. Perrin, La. App., 145 So. 685, 688, we said:
"It is quite obvious to us that the occupants of the Ford automobile erroneously approximated the distance that the defendant's car was from them at the time the Ford car was driven into the roadway. While the law does not require the driver of an automobile to judge the distance between his machine and another and its speed with absolute accuracy, he is required to do so with reasonable care and caution, such as an ordinarily prudent driver would do under similar circumstances, and commensurate with the danger involved."
Having reached the conclusion that both drivers were at fault and that the accident would not have occurred had either exercised proper care, it is necessary to consider the legal question which is presented. Does the negligence of young Pancoast prevent recovery by Pancoast, Sr. for damage sustained by his car?
It is well settled that the owner of an automobile may recover for damage sustained by it in an accident to which the negligence of the borrower may have contributed. Adam v. English, La. App., 21 So.2d 633; Manley v. Hammons, La. App.,20 So.2d 817; Honeycutt v. Carver, La. App., 25 So.2d 99.
Unless, therefore, there was some legal relationship between Pancoast and his son which would create in the father legal liability for the results of the negligence of the son, then the mere fact that young Pancoast may have been at fault would not prevent his father from recovering from the other tortfeasor, since, as we have said, the mere fact that the son borrowed the car would not be sufficient to make the father responsible for the results of the son's negligence. If, however, the son was a minor at the time and resided with the father, then his negligence would bar recovery by the father, because of the effect of Article 2318 of our Civil Code.
The petition in reconvention alleges no facts which, if proven, would permit the application of this article, which reads, in part, as follows:
"The father, or after his decease, the mother, are responsible for the damage occasioned by their minor or unemancipated children, residing with them, * * *."
There is no allegation that young Pancoast was a minor, nor is there an allegation that he resided with his father. It is obvious that when the petition in reconvention was prepared, it was founded entirely on the theory that when a father allows a son to operate the family automobile solely for the pleasure of the son, the pleasure of the son is to be considered as a matter in the interest or welfare of the family and that therefore the operation of the automobile on such an occasion by the son is for the joint benefit of the son and the father.
In view of what our Supreme Court has said in Adams v. Golson, 187 La. 363, 174 So. 876, concerning the obligation of a husband to a wife in a somewhat similar situation, we have doubt as to whether or not, were it necessary to a decision, we would find ourselves able to hold that under the facts alleged the father could be held liable for the torts of the son, on the theory that the operation of the car by the son for his own pleasure could be considered as a joint venture of the son and the father.
Before investigating this interesting question, we deem it advisable to first consider whether the judge a quo was correct in permitting the instanter amendment under which defendants and the plaintiff in reconvention sought to prove that Pancoast, the father, should be held responsible for the negligence of his minor son residing with him, and whether, if that amendment was properly admitted, the facts as they finally appear in the record would make the father responsible for that negligence of his son.
For a time our Supreme Court waivered between the view that a petition which does not set forth a cause of action *Page 459 
amounts to nothing and can not be amended and the present view that where a petition fails to state a cause of action merely because of insufficiency of allegation, an opportunity to amend should be permitted. The former view was followed in West Orleans Beach Corporation v. Martinez, 180 La. 31, 156 So. 165; Tremont Lumber Co. v. May, Assessor, et al., 143 La. 389, 395, 78 So. 650; State v. Hackley, Hume Joyce, 124 La. 854, 50 So. 772; and Abadie v. Berges, 41 La. Ann. 281, 6 So. 529. This view was, we think and hope permanently abandoned when the Supreme Court decided Reeves v. Globe Indemnity Co. of New York, 185 La. 42, 168 So. 488, in which the Court discussed at length the conflict in the jurisprudence of the State and held that an amendment should be permitted. See, also, Purpera v. Fidelity Deposit Co. of Maryland, La. App., 189 So. 639; Dumaine v. Gay, Sullivan Co., La. App., 171 So. 396.
Counsel for defendants and plaintiff in reconvention rely upon this liberal rule concerning amendments and there can be no doubt that the established rule now is, as set forth in Southport Mill v. Friedrichs, 167 La. 101, 118 So. 818, that where it is possible that, by additional allegations, necessary facts may be set forth and that thereby a cause of action may be stated, an opportunity to allege those facts should be afforded.
There are in the petition in reconvention no allegations which affirmatively show that no cause of action exists. The fault lies merely in the failure of the petition to set forth that the son was a minor at the time and that he resided with the father. There was nothing to show that these allegations could not be made.
However, counsel for plaintiff (defendant in reconvention) contends that this liberal rule has application only to an original petition and not to a petition in reconvention, and asserts that there can be no amendment to such a petition and that where there is a failure to allege necessary facts or where, for other reasons, such a petition in reconvention is vague, no evidence should be admitted in support of it. In this connection we note what we said in Robert v. Blythe, La. App., 145 So. 15, 16, wherein it was contended that no evidence should be permitted in support of a plea in compensation because of insufficiency of allegations:
"A plea in compensation should be set forth with the same certainty as is required by a plaintiff in a direct action. The penalty for a failure to do so is attendant with somewhat different consequences due to the absence of replication in our system of pleadings. The failure of the plaintiff to give necessary details is not fatal, since he may amend following the maintenance of an exception of vagueness, but the failure of a defendant to meet the necessities of pleading results in the deprivation of the right of presenting proof in support of his claim; no amendment being permitted. This is true with respect to the analogous plea in reconvention. Stringfellow v. Nowlin Bros., 157 La. 683, 102 So. 869; Stroud v. Beardslee, 2 Mart., N.S., 84; Perry v. Gerbeau, 5 Mart., N.S., 14; McMasters v. Palmer, 4 La. Ann. 381; Wilcox v. His Creditors, 11 Rob. 346."
However, we are impressed with what we held in Chagnard v. Schiro, La. App., 156 So. 58, in which the lower court refused to permit the amendment of a petition in reconvention. There the conclusion which we reached was that where the amendment would merely amplify the defense it should be permitted. We suggested or hinted at a possible distinction between an amendment insofar as it amplifies the reconventional demand and the amendment which, though in a reconventional demand, merely amplifies the original defense. It may be that there is such a distinction and that where it is sought to amend allegations of a reconventional demand insofar as that demand sets up a claim against plaintiff in the main demand, such an amendment might not be permitted, but that insofar as it merely sets forth other facts on which the main demand should be rejected, it is proper to admit it.
If there is, in some situations, reason for recognizing such a distinction, we find the question of no interest here for, having already concluded that the reconventional demand, for other reasons, must *Page 460 
be rejected, we are faced only with the more simple problem of determining whether an amendment which amplifies the defense originally set up is objectionable. And we conclude that it is not.
In Southport Mill v. Friederichs, supra, in which was involved the question of whether a supplemental and amended answer should be permitted, the Court said [167 La. 101,118 So. 820]:
"Our conclusion is, also, that the court below should have permitted the supplemental answer to be filed. In this particular pleading, defendant has done nothing more than amplify his denial of the allegations of plaintiff's petition by setting forth the reasons why plaintiff should not recover. He does not change the original relief asked for, which is the rejection of plaintiff's demands."
And in the case of Chagnard v. Schiro, supra, we permitted an amendment which not only amplified the original defense, but also set up a claim in reconvention.
In the case at bar the issue on the main demand has in no way been changed. The main defense is that the plaintiff cannot recover because his right is destroyed by the negligence of his son for which he is responsible. That is also the issue set up by the amendment which was properly admitted.
Having reached this conclusion, it becomes necessary to determine whether the record shows the facts which must appear if, because of Article 2318, the faults of the son are to be visited upon the father.
Counsel for Pancoast concedes that the record shows that at the time young Pancoast was only twenty years of age, but he declares that the "record * * * is entirely silent on the question as to where Pancoast, Jr. resided." We do not agree that the record is silent on this question. It is true that there is no express statement by the young man nor by his father nor by anyone else to the effect that the boy resided at home with his father. But it is impossible to complete a reading of the record without reaching the conclusion that it gives a clear picture of a son living at home with his father in a normal family relationship. The son states that when he decided to go to other places of amusement than those at which he had been spending the earlier part of the evening, he went to his home. He says that his companions "took me back to my house," and he adds that "we stayed around my house for a while," and he then says that he decided to take his father's car, so he "went inside," got the keys from his father, and told him "I would use the automobile."
In this connection it is interesting to note from the record that apparently when Pancoast, Jr., was placed upon the stand, according to the stenographer, he "gave his address as 4323 Toulouse Street," and that the father, Paul Pancoast, Sr., when placed on the stand, also gave his address as 4323 Toulouse Street.
These statements and other facts show clearly that the son lived at home with his father, and even if they merely raised such an inference, we would reach the same conclusion we arrived at in Epps v. Standard Supply Hardware Co., La. App.,4 So.2d 790, 792, in which we said:
"There is some indication in the record that young Epps resided with his father and nothing to the contrary. We will, therefore, presume that young Epps lived a normal life under the roof of his father."
We must, therefore, hold that since young Pancoast was guilty of negligence which contributed to the accident, this negligence prevents recovery by the father, plaintiff in the main demand.
In Di Leo v. DuMontier, La. App., 195 So. 74, 76, we said:
"Since it is shown that young Di Leo was a minor and was residing with his father, it follows that his said father is responsible for any loss resulting from his negligent acts. Revised Civil Code, Art. 2318. Therefore, being responsible for the results of these negligent acts of his son, he is prevented from recovering for the damage sustained by his car."
See, also, Epps v. Standard Supply Hardware Co., supra; Adams v. English, supra.
We attach little importance to the fact that the driver of the taxicab, whose correct name was Eugene Sola, was using *Page 461 
the name of James Martin. It is true that he had had difficulties with the authorities of the armed forces and that this, to a considerable extent, clouds his good name, but it does not make it necessary that we disregard his testimony, which we think is corroborated by the physical facts.
We conclude that both the main demand and the reconventional demand should have been dismissed. Accordingly, the judgment appealed from, insofar as it runs in favor of plaintiff, is annulled, avoided and reversed. In all other respects it is affirmed at the cost of plaintiff-appellee.
Judgment reversed in part — affirmed in part.
REGAN, J., takes no part.