Shortly after twelve o'clock noon on December 13th, 1946, plaintiff, Cornelius G. Maher, while crossing Poydras Street in a downtown direction on the river side of Baronne Street, was struck near the middle of the street by an automobile truck of National Linen Service Corporation, which had been driven up Baronne Street and had turned to its left towards the Mississippi River just as plaintiff was crossing. Maher was rather seriously injured, and, alleging that he himself had been without fault and that the accident had been caused by negligence of the operator of the said truck, he brought this suit against National Linen Service Corporation and its liability insurance carrier, Maryland Casualty Company, claiming damages in the sum of $25,320.00. *Page 102 
Defendants admitted the occurrence of the accident but denied that there had been any negligence on the part of the operator of the truck and averred that the sole cause of the accident had been the carelessness of Maher himself, who was crossing Poydras Street and could have crossed in safety but for the fact that after "he had cleared the path of the truck which was in the act of turning * * *" he, plaintiff, saw another truck "coming out Poydras Street in the direction of the lake * * *," and fearing that this other truck would not stop "jumped backwards directly into the path of the truck which was then in the act of turning * * *."
In the alternative that it appear that there was any negligence on the part of the driver of the truck, the defendants specially pleaded contributory negligence on the part of Maher, and averred that the proximate cause was that contributory negligence as above alleged.
There was judgment in favor of plaintiff and against the defendants in solido in the sum of $5,910.00. Both defendants have appealed. Plaintiff has answered the appeal praying that the amount awarded be increased by $2500.00.
The facts are in dispute only in one particular and that is whether or not when Maher was struck, he was walking forward across the street or had stopped and stepped backward unexpectedly and just before the truck reached him. The district judge found that he did not step backward and gave written reasons for his conclusion.
There were only three witnesses who testified as to the facts surrounding the accident, though there is much medical evidence as to the extent of plaintiff's injuries. The three witnesses who testified concerning the accident were plaintiff himself, Thomas P. Molinary, Sr., who was the driver of the truck, and Curtis N. Beckman, a pedestrian who was walking down Baronne Street a short distance behind plaintiff.
As we have said, the accident occurred in the intersection of Baronne and Poydras Streets. Baronne Street is a one-way street on which traffic is permitted to operate only in an uptown direction. Poydras Street is a very wide thoroughfare on which traffic proceeds in both directions. There is a traffic signal light at that corner and this light was operating at the time. As plaintiff reached the corner, the light facing him was green and he stepped into Poydras Street on his way across. The truck was going up Baronne Street and consequently the light which faced it was green also. Plaintiff reached a point somewhere near the center of Poydras Street when the truck, which had turned to its left into Poydras Street, struck him. The truck had what is known as a panelled body and had a capacity of 3500 pounds. It was not fully loaded, but there was a large quantity of soiled linen on its top. We point this out because the driver said that due to this load on top he was careful to make the turn slowly for, had he made a fast turn, this top-heavy load might have turned the truck over.
Maher, the plaintiff, says that he did not see the truck; that his attention was focused on the green light and that suddenly the truck which, until then he had not noticed, turned to its left and ran him down. He says that he did not step backwards, but was on his way across when he was hit. Molinary, the driver of the truck, says that he saw Maher and that he knew that the truck could pass to his rear, and that it would have done so had Maher not suddenly stopped his forward motion and stepped backwards just before the front of the truck reached him. Molinary says that Maher did this because of another truck which was going out Poydras Street in the other direction, and that Maher seemed to fear that this other truck would not stop and might strike him. Maher says that he saw no such other truck.
The third witness, Beckman, knew very little about the occurrence because he, too, had concentrated his attention on the light on Poydras Street which he, like Maher, was about to cross. When Beckman was asked: "* * * did he step backwards before he was struck, or did he step sideways before he was struck?" he answered "I don't know." However, in another cross-interrogatory, he was asked "Was Mr. Maher still walking when he was struck, or had he stopped in the middle of *Page 103 
Poydras Street?" and he answered "Mr. Maher was moving."
Counsel for plaintiff points out several provisions of the City Traffic Ordinance, No. 13702, C.C.S., as amended, and he says that because of those provisions plaintiff, under the circumstances, was entitled to the right of way. The particular provisions on which he relies read as follows:
Article IV, paragraph 3, entitled Pedestrians' Rights and Duties at Controlled Intersections, provides:
"(a) At intersections where traffic is controlled by traffic control signals or by police officers, operators of vehicles shall yield the right of way to pedestrians crossing or those who have started to cross the roadway on the green or 'Go' or on a 'Walk' signal and in all other cases pedestrians shall yield the right-of-way to vehicles lawfully proceeding directly ahead on a green or 'Go' signal. At all points where vehicles may be permitted to turn on Red signals pedestrians shall have right-of-way over vehicles turning on Red signals unless otherwise directed by a police officer. It shall be unlawful for pedestrians to leave the sidewalks at intersections controlled by police officers or traffic control signals until the signal is given allowing them to proceed.
"(b) A pedestrian who faces a 'Go' signal and starts across the street must be permitted to continue his course even though the signal may change and exhibit a 'Go' signal to vehicles on the cross street.
"(c) When both a pedestrian and a vehicle face a 'Go' signal and the pedestrian starts across the roadway in the direction permitted, and the vehicle proceeds to turn to either the right or left, overtaking such pedestrian, the vehicle shall yield to the pedestrian."
Article VI, paragraph 3 (Turning at Intersections), sub-paragraph (f), Turning Left on "Go" Signal: "The operator of a vehicle or street car intending to turn to the left at an intersection where traffic is controlled by traffic signals or by a police officer, and where a left turn is permitted shall proceed to make such left turn with proper care to avoid accident, and only upon the 'Go' signal, unless otherwise directed by a police officer or by special sign installed at that point."
Counsel also points to paragraph 2 of Article IV, sub-paragraph (a), which provides that vehicles shall yield the right of way to pedestrians who may have entered the street at a proper pedestrian path, provided the pedestrian has started across before the vehicle enters the intersection.
Counsel especially lays great stress on sub-paragraph (c) of paragraph 3 of Article IV as quoted above, and he says that that provision applies to the exact situation which is presented here.
Counsel for defendants, on the other hand, assert that that provision has no application here, and they particularly call attention to the word "overtaking" as it appears in that provision, and they say that it indicates that that paragraph applies only when the pedestrian and the vehicle — before the latter made the turn — were proceeding in the same direction. Counsel say that a vehicle cannot "overtake" a pedestrian unless the vehicle and the pedestrian are proceeding in the same direction.
In Mahne v. Steele, La. App., 32 So.2d 761, we found facts practically identical with those presented here. The only difference between the two sets of facts is that in the Mahne case the vehicle turned to its right, whereas in the case at bar the truck turned to its left. In both however, the vehicle approached the intersection from the direction opposite that from which the pedestrian had approached it. That difference does not create a distinction because the provision of the ordinance which is now under consideration applies if the vehicle turns "either to the right or left." In the Mahne case we applied that provision of the ordinance which is now under discussion to those facts. It is true that in that case there was not presented the contention which is before us, i. e., that that provision of the ordinance applies only when the vehicle and the pedestrian approach the intersection from the same direction, and since it was not presented, we did not discuss it nor did we spontaneously consider it.
While we are of the opinion that, in all probability, the framers of the ordinance *Page 104 
intended that provision to apply whether the vehicle and the pedestrian approach the intersection from the same direction or not, and while we believe that the purpose would more clearly have been accomplished by the use of such a word as "approaching" instead of the word "overtaking", we find it unnecessary to reach a conclusion because we feel that whatever the ordinance may mean and whether or not there is any provision which does apply perfectly to this situation, there is a duty in the operator of a vehicle which is making such a turn to exercise extreme care towards pedestrians who may be already in the roadway, especially if those pedestrians have entered the roadway on a favorable traffic signal.
We think that the reasoning which is found in Rottman v. Beverly, 183 La. 947, 165 So. 153, Jackson v. Cook,189 La. 860, 181 So. 195, and Jones v. American Mutual Liability Ins. Co., La. App., 189 So. 169, is applicable, and that where a pedestrian is already in the roadway and no longer has the ability to save himself, there is liability if the operator of a vehicle, who could avoid the pedestrian, fails to do so. We set forth again the following quotations from those decisions as we did in Mahne v. Steele, supra.
"* * * that the duty of those in charge of motor cars and engines to look ahead and observe never ceases; that what they can see they must see and in legal contemplation they do see; that their failure to see what they could have seen by the exercise of due diligence does not absolve them from liability." Jackson v. Cook, supra [189 La. 860, 181 So. 197].
"* * * The first duty of those who operate engines or motor vehicles is to keep a sharp lookout ahead to discover the presence of those who might be in danger. * * *" Rottman v. Beverly, supra [183 La. 947, 165 So. 156].
"We readily recognize that it is the duty of a motorist to be constantly vigilant and observe the presence of anything which is at or near the path of his travel." Jones v. American Mutual Liability Ins. Co., supra [189 So. 172].
We, therefore, reiterate that we do not see that the question of whether plaintiff did or did not have the right of way is at issue here. The sole question which is presented is one of fact. Did plaintiff step backwards into the path of the car? If he did do so, when he had already cleared the path by a sufficient distance for the truck to pass him safely, then he was at fault and should not recover. If he did not do so and was struck because the driver carelessly ran into him, or carelessly attempted to pass too close to him, then plaintiff should recover.
We think that it is most significant that immediately after the accident the driver of the truck made a statement to the police in which he did not say that Maher had stepped backwards into the path of the truck and in which, so far as the record shows, he did not say that he had seen any other truck approaching on Poydras Street from the other direction.
If Maher stepped backwards into the path of the truck, we have no doubt at all that the first statement which Molinary made would have referred to that fact.
If there was another truck approaching from the other direction and because of which Maher would have stepped backwards as Molinary claims, that other truck would have been facing a red light, and it must be assumed that it would have been reducing its speed preparatory to stopping. It must be presumed too that Maher would have known that a red light was facing the other truck since a green light faced him, and would have assumed that the other truck would stop and would not strike him.
In view of these facts, but particularly because of the finding of the district judge, we conclude that the truck turned to its left and struck plaintiff while he was walking forward, and that he did not step backwards into its path. On that fact we base our conclusion that the defendants are liable.
Maher was first taken to Charity Hospital in New Orleans, but when it was found that he was a war veteran, he was, in a few hours, removed to the Veterans Administration Hospital on the shores of Lake Pontchartrain. There it was found that, in addition to bruises and contusions, he had sustained a fracture of the left "lateral *Page 105 
tibial plateau." The hospital record shows that that fracture was "slightly comminuted," and that there was "suggestive evidence of at least four pieces." The report also shows that Maher had sustained "an incomplete vertical fracture involving the distal articular surface of the radius" of the right wrist.
We are told that the tibia is the large bone in the lower leg. The fracture of the tibia was set and there was applied internal metallic fixation, which was not removed until May 7, 1947, almost five months after the occurrence of the accident.
Maher remained in the hospital until June 19, 1947, or for a total period of more than six months. He then was required to take physiotherapy treatments about three times a week until the month of November. At the time of the trial below, which was in January, 1949, he had recovered almost the entire free use of the left leg, and apparently he sustained no permanent injury whatever as a result of the fracture of the wrist.
According to the report of Dr. E. H. Maurer, who testified as a witness for plaintiff, plaintiff now has a "painful, weak knee which will prevent him from engaging in any occupation in the heavy industries."
According to the report of the late Dr. Frank Brostrom, which was made on July 24, 1947, while plaintiff had recovered almost the entire use of his knee, it was "not as freely movable as * * * the normal right knee." At that time Dr. Brostrom expressed the opinion that the disability was high, but that Maher would ultimately "get a good functioning knee with little residual disability."
Dr. George D. B. Berkett, who was employed by the defendants, made a report on March 15, 1948, and at that time he found that Maher's disability "is due to his inability to flex the left knee beyond 80 degrees." He found that Maher could walk without a limp and could carry on "his usual daily tasks without impairment of efficiency." He further stated that there was a distinct probability that "the range of motion in the knee will increase with time." At that time he estimated Maher's disability as six per cent.
It thus appears that the plaintiff remained in the hospital about six months and that for about five months in addition he was under treatment.
For some months prior to the accident he had not been employed, but apparently he had earned, when employed prior to that time, $36.00 per week with a 17% bonus.
The district judge allowed plaintiff $5000.00 for physical injuries and $910.00 for loss of earnings. He stated that he based this award for loss of earnings on the fact that plaintiff could probably have earned $35.00 per week had he been employed, and on the further fact that he did not feel that plaintiff should be allowed recovery for loss of earnings for the entire time during which he was disabled because of the fact that he had not been employed for some time prior to the accident. The judge stated: "* * * Since plaintiff was not employed at the time of the accident, nor for some months prior thereto, it would be too speculative to require defendants to indemnify him for the full twelve (12) months unemployment during disability. Accordingly, I think plaintiff is entitled only to twenty-six (26) weeks salary at $35.00 per week, or $910.00. * * *"
We agree that it would be unfair to the defendants to allow plaintiff to recover for the full loss of earnings. Nor would it be fair to plaintiff to refuse to allow any recovery for loss of earnings solely because of the fact that at the time of the accident he was unemployed. We know of no fairer way to arrive at a proper amount to be allowed on this item than to estimate, as did the district judge, that he probably would have been employed for about one-half of that time and to hold that he is entitled to $910.00 for the deprivation of his ability to earn an income while he was disabled.
When we come to consider the amount allowed for the physical injuries, we reach the conclusion that that amount allowed below ($5000.00) is substantially higher than what has been allowed for similar injuries in other cases. The physical injuries sustained by the plaintiff in Mahne *Page 106 
v. Steele were quite similar to those sustained here, and there the plaintiff was awarded only $1250.00 for those injuries. However, we call attention to the fact that when the defendant in that case appealed there was no answer by plaintiff to the appeal and consequently the amount allowed below could not be increased by us.
In Gremillion v. American Creosote Works, La. App.,14 So.2d 72, the plaintiff sustained an injury somewhat similar to that suffered by plaintiff here. He was disabled for a period of ten months, after which he was able to return to light work. He was awarded $3500.00.
In Hero v. Toye Bros. Yellow Cab Co., La. App., 19 So.2d 887, 891, we allowed $3000.00 where the plaintiff sustained a fracture of the lower part of the left leg which involved both bones of the leg. In that case we said: "A review of the jurisprudence reveals that amounts ranging from $1,500 (see Thomas v. Shippers' Compress Warehouse Co., La. App., 158 So. 859, and Lervick v. White Top Cabs, La. App., 10 So.2d 67) to $2,000 and $2,500 (see Selby v. Manning, La. App., 145 So. 555); Breaux v. Roussell, La. App., 151 So. 267 and Cato v. City of New Orleans, La. App., 4 So.2d 450) have been allowed by this court for leg fractures where there have been no serious complications and no permanent injuries have resulted. The award in this case is only slightly above the maximum amounts heretofore allowed for similar injuries, and considering the decreased purchasing power of the dollar, we believe that the judgment is proper and that it represents fair compensation under present conditions."
It is contended by counsel for defendants that, because of the fact that Maher had always been engaged in clerical work and had not done heavy labor, the injury sustained by him should not entitle him to so great a recovery as would be allowed should a similar injury be sustained by a laborer. It may be that there is some logic in this contention.
In view of all of the facts, particularly the fact that in all probability plaintiff has recovered or will recover practically the full use of his leg, we reach the conclusion that $5,000.00 is somewhat excessive and accordingly, have decided to reduce that amount to $4,000.00
It is, therefore, ordered, adjudged and decreed that the judgment appealed from be amended by the reduction of the amount thereof to $4,910.00 and, as thus amended, it be affirmed, plaintiff-appellee to pay costs of appeal, defendants to pay all other costs.
Amended and affirmed.