73 So.2d 196 (1954)
ANDERSON et al.
v.
MORGAN CITY CANNING CO., Inc. et al.
No. 20311.
Court of Appeal of Louisiana, Orleans.
June 7, 1954.
*198 George W. Reese, Jr., Arnold C. Jacobs, New Orleans, for plaintiffs-appellants.
Donald L. Peltier, Bernard J. Caillouet, Harvey Peltier, Thibodaux, for Morgan City Canning Co., Inc., defendant-appellee.
Lemle & Kelleher, H. Martin Hunley, Jr., New Orleans, for Underwriters at Lloyd's, London, defendant-appellee.
Henry L. Hemelt, New Orleans, for Board of Administrators of Charity Hospital of Louisiana at New Orleans, intervenor.
McBRIDE, Judge.
This joint suit was instituted by twelve Negroes, eleven men and one woman, who allege they sustained physical injuries as a result of a collision between a Ford truck in which they were riding and a passenger bus, which occurred about 4:30 a. m., on November 19, 1949, at a point where Louisiana Highway 670 (known as the Paul Maillard Road) intersects U. S. Highway 90 at Boutte in St. Charles Parish. Amada Williams, one of the plaintiffs, who owned the Ford truck involved, also seeks recovery of damages for the complete destruction of the truck. Named as defendants are Morgan City Canning Company, Inc., and its liability insurer, Underwriters at Lloyd's, London, the latter having issued to Morgan City Canning Company, Inc., an "Excess Coverage" policy. The plaintiff Jim Hanford died of natural causes subsequent to the trial of the case and no parties were substituted in his place. The matter comes before us on the appeal prosecuted by the remaining eleven plaintiffs from a judgment which dismissed their suit.
As is well known, U. S. Highway 90, commonly referred to as the Old Spanish *199 Trail, runs cross country from Florida to California; at the point of the accident it is a paved strip just wide enough to accommodate two lanes of traffic. The Paul Maillard Road intersects the Old Spanish Trail at the town of Boutte at right angles; this road has the characteristic of being paved from the Mississippi River until it touches Highway 90, but on the other side of Highway 90 the road has a graveled or shelled surface.
The twelve plaintiffs, composing a fishing party, left New Orleans at about 3:30 a. m. in the 1938 stake-body Ford truck and proceeded westward toward Little Caillou near Houma. Johnny Watts was doing the driving and James Robinson was seated beside him in the cab. The other plaintiffs were either seated or standing in the body of the truck which was completely covered by a large tarpaulin which obliterated a forward view, and they were unable to testify as to the circumstances leading up to the accident.
The bus, owned by Morgan City Packing Company, is equipped with cross seats and is twenty feet long, and is operated by the said defendant to transport its laborers to and from their work. Wilbert Harris, an employee of the Morgan City Canning Company, Inc., drove the bus. Just before the accident, Harris had taken a colored woman aboard the bus about 100 feet from Highway 90. Harris, after starting the bus in forward motion, proceeded along the graveled or shelled surface of Paul Maillard Road and entered Highway 90, his intention being to make a crossing of the highway in order to proceed on the paved portion of Paul Maillard Road toward the general direction of the river. The front of the truck in which the members of the fishing party were riding struck the right front portion of the bus at about the swinging door which the operator of the bus manipulates by means of a lever. The point of collision was just off Highway 90 and the forward portions of each vehicle came to rest on the right shoulder of the highway to the west side of Paul Maillard Road.
Plaintiffs charge that the cause of the collision was the negligence of Harris in failing to heed the stop sign facing the bus as it made entry into the intersection and in failing to maintain a proper lookout. Defendants deny negligence on the part of Harris, averring that he stopped at Highway 90 and then proceeded across; that his vehicle had almost completely traversed the intersection when struck by the Ford truck. Defendants allege that the sole cause of the accident was the negligence of Johnny Watts, the truck driver, in failing to maintain a proper lookout, in failing to keep his vehicle under control, and in driving without lights. In the alternative, the defendants pleaded the contributory negligence of all parties in bar of their recovery.
Johnny Watts stated in his depositions he was driving at about 25 to 35 miles per hour and noticed the bus approaching the highway from his left. He says he was under the impression "the bus was going to stop so being on the Highway I continued on up and when it didn't stop, I left the highway to try to avoid an accident." He applied his brakes and swerved to the right so as to avoid crashing into the middle portion of the bus. Watts estimates the speed of the bus anywhere from 10 to 35 miles per hour. Robinson, who was seated beside Watts, testified that he also observed the bus approaching from the left when it was about 10 feet away from Highway 90 and it continued onward and entered the highway without stopping or slowing when the truck was from 10 to 15 feet away from the intersection. Robinson fixed the truck's speed at from 30 to 35 miles per hour and he says Johnny Watts applied his brakes and veered right or toward the front portion of the bus.
Wilbert Harris testified he had been employed by the Morgan City Canning Company for about eight years, and his duties are to collect its laborers and carry them to and from work in the bus. On the morning in question he "picked up" the colored woman in front of the church on *200 Paul Maillard Road located some 100 feet from the highway. As he had come from the other direction, it was necessary for Harris to turn the bus around after receiving his passenger; he then proceeded toward the highway. Harris was familiar with the stop sign and he says he drove in low gear to a point about 15 feet from the highway. He then went on to say:
"* * * I stopped the bus at the stop sign and I opened my door and looked, and I did not see anything coming. * * *
"I put it in low gear and started across the highway. * * *
"I came across in low gear. The front end of my bus got across the pavement, and then I felt the lick. I didn't see anything; I just felt the lick."
Defendants stress the contention that the truck was being driven without lights. That argument is based on the assumption that because Harris and a passenger who looked from one of the windows of the bus did not see the oncoming truck, that its lights could not have been illuminated. Harris' story that the truck was not lighted seems to be nothing more than an afterthought and an unjustifiable attempt to absolve himself from blame. The State Trooper who appeared on the scene and conducted an investigation testified emphatically that Harris made no mention to him that the truck's lights were not turned on, else he would have so stated in the report submitted by him. Watts, Robinson, and several of those riding in the truck testified that the lights were illuminated at the time of the crash and had been in operation from the time the truck left New Orleans. The passengers boarded the truck from two points, and their testimony is that they were "picked up" by the lights of the truck. Watts also stated that on the Friday before the accident the generator on the truck had been repaired and all electrical equipment, including the lights, was checked. Furthermore, the Trooper examined both vehicles at the scene and found the lights on each in good working order, a notation to that effect being carried in his written report.
In view of the evidence as we appreciate it, the only conclusion which can logically be reached is that the driver of the canning company bus either ignored the stop warning, or after stopping failed to take into consideration the close proximity of the truck to the intersection. There is no evidence tending to show that the Ford truck was traveling at an unsafe or excessive speed, and it is manifest that the truck was almost upon the bus when Harris attempted his ill-timed crossing. Watts, under the emergency created by the bus driver, seems to have done what any reasonable motorist would have done under similar circumstances, and that is, to immediately apply his brakes and endeavor to swerve away from the other vehicle. Had he not done this, the Ford truck for a certainty would have crashed into the middle of the bus. True, Watts and Robinson both noticed the bus approaching the highway, but they believed it would stop in obedience to the warning sign. This was a fair assumption on their part for the jurisprudence of this State is clear that a driver on a right-of-way thoroughfare has the right to entertain a belief that motorists on intersecting streets and roads will comply with the law and stop when required. Koob v. Cooperative Cab Co., 213 La. 903, 35 So.2d 849; Cole v. Sherrill, La.App., 7 So.2d 205. If Harris stopped as he insists he did, his negligence was equally as great as if no stop had been made. It is well settled that a motorist who merely stops before attempting to enter into a right-of-way thoroughfare has only performed one-half the duty resting upon him. To stop and then proceed forward without ascertaining if it is safe to do so is negligence of a gross character and renders the person guilty of such imprudence responsible in damages resulting therefrom. Porter, for and on Behalf of Porter v. De Boisblanc, La.App., 64 So.2d 864; Pancoast v. Cooperative Cab Co., La.App., 37 So.2d 452; Glen Falls Ins. Co. v. Copeland, La.App., 28 So. *201 2d 145; Arline v. Alexander, La.App., 2 So.2d 710; Smith's Tutorship v. Perrin, La.App., 145 So. 685; Goff v. Southern Coffee Mills, La.App., 144 So. 513.
Even if we take Harris' word for it that he both stopped and looked, he is nonetheless guilty of negligence. A motorist is under the duty to look at all times and he must see what he can see and in legal contemplation does see, and his failure to see what could have been seen by exercising due diligence does not absolve him from liability for resulting injuries to others. Jackson v. Cook, 189 La. 860, 181 So. 195; Maher v. New Orleans Linen Supply Co., La.App., 41 So.2d 101; Mahne v. Steele, La.App., 32 So.2d 761.
Defendants' chief theory is that the bus had pre-empted the intersection and Watts was negligent in not recognizing and respecting Harris' superior position. We have already mentioned that the overall length of the canning company bus was twenty feet; Highway 90 at the point where the collision took place has two traffic lanes and is but eighteen feet wide. It requires but little imagination to suppose that when the Ford truck was almost at the intersection, the lumbering bus came out into the highway without warning and loomed up in front of Watts completely blocking the highway. The evidence does not show that the bus had about entirely crossed the highway; on the contrary, it appears that the greater portion of the bus was still on the paved strip when the crash came. For the benefit of the court and counsel, the State Trooper depicted on a diagram the relative positions assumed by the two vehicles after the crash, and this reflects that the bus came to rest at a forty-five-degree angle with its nose on the right shoulder bordering the highway with two-thirds of its body still on Highway 90. The Ford truck stood at the same angle as the bus with one-third of its body remaining on the highway. Defendants can find no solace in their assertions that there had been such a pre-emption by the bus as would accord it the right to complete the crossing. It has been said over and over again by our appellate courts that pre-emption does not mean the prior entry of a vehicle simply by a matter of a few feet or by a fraction of a second before the other vehicle. In order to serve as a foundation for a charge of negligence, such pre-emption must be construed to mean an entry into an intersection with full opportunity of clearing the same under normal circumstances and without obstruction of the path of another vehicle such as to cause it to make an emergency stop. Boudreaux v. Moreau and United States Casualty Co., La.App., 73 So.2d 192, and cases therein cited. We believe that fault can be placed squarely on the shoulders of the canning company's driver who attempted to negotiate a crossing of an important highway from a secondary graveled road without keeping a proper lookout and oblivious of traffic conditions. Even if the testimony of the plaintiffs were to be entirely disregarded, Harris' testimony alone would convict him of the grossest kind of negligence. We fail to comprehend how it can be said that there was any negligence whatever on the part of any of the plaintiffs.
We are fully aware that on issues of fact great weight is placed on the findings of the trial judge and his judgment is not to be disturbed unless manifestly erroneous. But after a careful analysis of the evidence, we readily conclude that reversible manifest error does appear in the judgment before us. It is fitting to here quote what we said in Owens v. Felder, La.App., 35 So.2d 671, 672:
"We are reluctant to reverse the finding of a trial court based primarily on questions of fact, but in a case, such as we are presently analyzing, it is a self evident principle that it is occassionally easier to perceive fallacies and inconsistencies contained in the record by a comparison of the various portions of the transcribed record with other pertinent portions than it is to accurately observe and catalogue them while listening to the oral evidence of *202 the various witnesses who testified during the course of the trial."
We entertain no doubt that each and every one of the appellants sustained injuries in some form or other in the accident; some were treated at the Charity Hospital at New Orleans while others may have been attended by their private physicians. However, the assessment of the quantum is, indeed, a most difficult task for none of the hospital or attending physicians were called as witnesses and we find in the record only sketchy charts and reports of the Charity Hospital, parts of which are illegible, concerning some of the appellants. These charts constitute prima facie proof of their contents under the provisions of LSA-R.S. 13:3714. Dr. Rufus H. Alldredge, an orthopedic specialist, pursuant to an agreement between counsel, examined three of the appellants about a year afterward, and his testimony will be referred to in connection with the claims of those persons examined by him. A plaintiff who fails to produce evidence of physicians which appears to have been readily accessible is nevertheless entitled to be compensated for his injuries if he can otherwise show the nature thereof. Cade v. Tafaro, La.App., 34 So.2d 72. But sight should not be lost of the well-known fact that claimants for personal injuries are always prone to exaggerate their damages.
Joseph Anderson, 66, claims his head, back, and right leg were injured and that he cannot walk at present due to a stroke which he ascribes to the accident. He testified he was taken to the hospital by an ambulance, and after being treated was permitted to leave as there was no available bed in which he could be placed. He made the further statement that an ambulance was sent to him "every day" to take him to the hospital and they "have been doing it ever since." He claims that about a month and a half after the accident his right leg was incased in a cast. This plaintiff has undoubtedly exaggerated his injuries beyond all reason. The hospital report reflects that Anderson was brought in by ambulance on November 19, 1949, "Treatment: A.T.S. sutured, X-rayno fract. seen." Anderson next went to the hospital on November 28, 1949, when it was found that a swelling of the right foot had subsided but the foot was still hot and painful. The sutures were removed from the scalp and the patient was sent to the Accident Room for a "re-X-ray" and told to soak the foot in warm water and return in two weeks. On December 12, 1949, X-ray of the right foot disclosed a fracture of the proximal third of the middle three of metatarsals. Anderson was advised to continue the warm soaks and remain in bed for one week with his foot elevated, and report back to the hospital. The right foot was still swollen on December 19, 1949. The patient was referred to "orthopedics" on January 5, 1950. On January 12, 1950, the metatarsal arch was swollen and painful, and Anderson was told to return to the hospital in four weeks. No further entries appear on the chart. There is no mention of a cast or that Anderson suffered a stroke. Dr. Alldredge's examination of October 19, 1950, revealed that the head injury had healed and there were no abnormal physical symptoms. Anderson was able to walk at a normal gait. Dr. Alldredge did find, however, that Anderson had a long-standing arthritic process in the right ankle joint which pre-existed the accident, and the doctor's opinion was that if there had been an injury of the ankle all ill effects had completely cleared up. Accepting the recitals of the hospital report, we believe that an award of $750 would do substantial justice in the case of this plaintiff.
Granville Bomon, 60, also endeavored to inflate his injuries. His story is that he was knocked unconscious and taken to the hospital by ambulance. He claims his left arm and wrist, side and head were injured and that it was from four to five months before he could "get out and hop around with a stick." He says the right side of his body still hurts him and his foot feels "dead." From the report it appears that Bomon went to the hospital only the one time, the morning of the accident, when *203 a laceration of the scalp was sutured, X-rays for fractures proving negative. Dr. Alldredge examined Bomon on October 17, 1950, and could find no abnormality except a ganglion-like lesion of the left wrist which he could not say was caused by the accident. Dr. Alldredge admitted, however, that trauma might have been the cause. There is nothing to support Bomon's contention that the wrist condition resulted from the accident except his own statement which is uncorroborated by any medical testimony, and we think this insufficient to establish the fact of permanent injury. See Simon v. Toye Bros. Yellow Cab Co., La.App., 152 So. 606. We believe $250 would amply compensate Bomon for the actual injuries sustained. Bomon's claim that because of the accident he lost three weeks' work at "$42, $43 and maybe $44 a week" is not substantiated and this item is denied.
Cleveland A. Dunbar, 37, said he sustained "a hole in the head," and bruises to the right arm. The hospital report shows that he was brought in by ambulance and his scalp sutured; no fractures were disclosed by the X-rays. This man is a government employee at the Port of Embarkation and it is reasonable to believe that he lost nine days' wages at the rate of $1.19 an hour as he claims. We think that an allowance of $250 for physical injuries plus $86.13 for loss of wages would constitute a fair award.
John H. Giles, 39, testified that his back, neck, chest, and right knee were injured. At the hospital to which he was conveyed by ambulance it was ascertained that the injuries were a laceration of the scalp and a sprained right knee. His head was sutured and he spent one week in the hospital. He wore a cast on the right leg until January 10, 1950, and we believe his statement that disability lasted until February 14, 1950. Dr. Alldredge, on October 17, 1950, saw nothing abnormal except atrophy amounting to one-quarter of an inch in the right leg as compared with the left, but he could not say that this condition resulted from the accident. Dr. Alldredge found no permanent injury and said the apparent atrophy might be a normal condition. The doctor did agree, however, that Giles had a sore knee "a long time" after the injury. This plaintiff, a laborer, claims that he lost at least three months' wages at the rate of $1.08 an hour, 8 hours a day, 5 days a week. This would appear reasonable in view of Dr. Alldredge's statement that Giles' knee was sore for a considerable period. We think this plaintiff should recover $518.40 for the loss of wages and $1,000 for physical injuries, pain and suffering.
George Gilmore, 67, testified his left hip and side were injured and he was sent to the hospital by ambulance and remained in bed for three weeks and wore crutches for the next four weeks. The meager hospital report shows Gilmore's treatment in the Emergency Room on the morning of the accident "X-ray negative for fracture, heat, clinic in one week." He returned to the hospital on December 1, 1949, with painful contusions of the chest and left hip and bed rest was ordered and he was requested to return in two weeks. The report contains no further entries. The allowance to Gilmore should be $400.
Arthur Grandison received no hospital treatment. His claim is that he sustained a severe sprain in the right instep and was laid up for more than three weeks. His testimony is uncontradicted, and having no reason to doubt it, we think he should be awarded $250 for the physical injuries plus the amount of wages lost for three weeks at the rate of $1.10 an hour amounting to $132. He was doing laboring work for Mundet Cork Corporation.
James Robinson was another who did not go to the hospital. When asked if he was injured, he replied: "My arm and my leg. * * * Just shook up." He claims incapacity and loss of wages for about three weeks. We seriously doubt any incapacity resulted from the minor injuries which he did not see fit to have treated by a physician. *204 For the physical injuries he is entitled to $100. His claim for loss of income is denied.
George Ross, 60, from the witness stand said that the calf of his left leg was injured and he was conveyed to the hospital and made another visit to the hospital about a week later. The report shows Ross appeared in the Emergency Room with bruises of the left shin and chest which were dressed. No other complaints or further treatment is shown. His injuries were of a minor type and our opinion is that his recovery should be fixed at the sum of $200.
Johnny Watts, 22, sustained an injury to the right leg requiring a short cast which remained in place for sixteen days. According to the hospital report, the fibular calcaneus ligament was damaged with a partially torn ligament in the ankle. On December 5, 1949, the cast was removed and Watts was told to return to the hospital in two weeks, but the record does not show that he ever returned. This plaintiff claims he was attending carpentry school under the G. I. Bill and was forced to abandon his course of study. He is now a member of the U. S. Army as a re-enlistee. We do not believe the injuries occasioned his leaving school and our thought is that he should recover $600 for the physical injuries and the discomfort of having to wear the cast for sixteen days.
Amada Williams testified his right shoulder was hurt and was immobilized in a sling for about two weeks by the doctors at the hospital, which seems to be borne out by the hospital record. He claims he was doing laboring work for Chassaniol Roofing Company and earned $14.82 per day and lost six weeks' wages. It would be hard to believe that Williams was incapacitated for a six-week period; therefore, we are unwilling to make an allowance for the asserted loss of wages. For his physical injuries, unquestionably of a minor nature, he should recover $250. Williams owned the Ford truck which he says was damaged beyond repair and disposed of to a junk shop for $20. He claims $900 for the loss of the truck. We do not doubt that the Williams vehicle was seriously damaged by the impact, but the record does not show its value before the accident. The only evidence touching on this point is the statement of Williams that he bought the truck for $478 two years before the accident and expended $300 for repairs and improvements. The proper measure of damages when an automobile is destroyed so as not to be susceptible of repair is its fair market value immediately before the accident, less, of course, the amount received for salvage. We are unable to fix the amount of damages which may be due Williams for the alleged loss of his automobile. Under the circumstances, we believe the ends of justice would best be served by remanding the case in order that more definite evidence may be submitted. See Kotteman Furniture Co. v. McLellan, La.App., 2 So.2d 485.
Angelina Worthy went to the hospital and her multiple bruises and abrasions of the left ankle were cleaned and dressed in the Emergency Room and she was discharged. A recovery of $150 by this plaintiff will be fair.
Underwriters at Lloyd's, London, pleads it cannot be held liable under the policy issued to Morgan City Canning Company, Inc., because its contractual liability is limited. From a photostatic copy it appears that the contract is of that type referred to as "Excess Coverage." For personal injury to one person the insured, Morgan City Canning Company, Inc., alone bears loss up to $5,000 and the insurer is liable for any amount between $5,000 and $25,000. For personal injuries to more than one person in the same accident the assured bears the first $10,000 of loss and the Underwriters insure liability between $10,000 and $50,000. As to property damage the assured bears the first $1,000 of loss and the insurers liability begins at $1,000 up to a maximum of $5,000.
*205 Under the insuring clauses there is no liability in the insurer as the aggregate of the awards for personal injuries is much less than $10,000, and even if Amada Williams in the trial court can prove the complete destruction of the truck and show its fair market value prior to the accident, a judgment for the loss could not possibly be rendered for as much as $1,000.
The intervention of the Board of Administrators of the Charity Hospital at New Orleans, in which it claims the cost of hospitalization accorded to several plaintiffs, cannot be considered, as the intervenor neglected to appeal from the judgment which dismissed the intervention.
For the reasons assigned, the judgment insofar as it dismisses the demands of the appellants as against Morgan City Canning Company, Inc., be and the same is reversed and it is now ordered, adjudged, and decreed that the appellants have judgment against said Morgan City Canning Company, Inc., for the respective amounts as follows: Joseph Anderson$750; Granville Bomon$250; Cleveland A. Dunbar $336.13; John H. Giles$1,518.40; George Gilmore$400; Arthur Grandison$382; James Robinson$100; George Ross $200; Johnny Watts$600; Amada Williams $250; Angelina Worthy$150; all sums to bear legal interest from judicial demand until paid.
This cause is remanded to the lower court there to be proceeded with in accordance with law with respect to the demand of Amada Williams against Morgan City Canning Company, Inc., for property damage, the assessment of all future costs in connection with said demand to await the final determination thereof.
In all other respects, the judgment appealed from is affirmed. Morgan City Canning Company, Inc., is cast for the costs of both courts.
Reversed in part; affirmed in part; remanded.